# S T A T E   O F   M I C H I G A N

# C O U R T   O F   A P P E A L S

PEOPLE OF THE STATE OF MICHIGAN,

   Plaintiff-Appellee,

v

JOHN ANTHONY JERROLDS,

   Defendant-Appellant.

UNPUBLISHED
January 13, 2015

Nos. 318738/321800
Saginaw Circuit Court
LC No. 13-038593-FH

Before: TALBOT, C.J., and CAVANAGH and M. J. KELLY, JJ.

PER CURIAM.

In this consolidated appeal, which arises out of several incidents of commercial battery theft in Saginaw County, John Anthony Jerrolds appeals as of right his jury trial conviction of possession of burglar's tools[1] and larceny of property with a value of $1,000 or more but less than $20,000.[2]  After resentencing, Jerrolds was sentenced, as a fourth habitual offender,[3] to concurrent terms of 48 months to 20 years' imprisonment for both offenses.[4]  We affirm.

## I.  STATEMENT OF FACTS[5]

As background, commercial vehicles operate using more than one battery and the batteries are larger than car batteries.  Between May 13, 2012 and December 9, 2012, a series of commercial battery thefts occurred in Buena Vista Township.

---

[1] MCL 750.116.

[2] MCL 750.356(3)(a).

[3] MCL 769.12.

[4] Jerrolds was originally sentenced to 76 months to 20 years' imprisonment with 234 days' credit; however, the parties stipulated that offense variable 9 was inappropriately scored, which warranted resentencing and the trial court granted relief.

[5] The facts contained in this opinion were obtained through the testimony elicited at trial, which occurred August 27, 2013 through August 30, 2013.

A. INCIDENT OF MAY 13, 2012

On Sunday, May 13, 2012, Officer Jason Hendricks responded to a complaint of commercial battery theft at Kerry Transport[6] in the Buena Vista Township and spoke with the company's owner, Matthew Doyle. Doyle discovered that battery covers were taken off of three trucks,[7] the terminals were disconnected from the batteries, and a total of 12 batteries were stolen. The batteries were valued at $1,521.48. Officer Hendricks viewed the surveillance video taken, which showed a black extended cab Ford Ranger pickup truck with accents over the front wheels enter the property. The video also showed a person, who was described as a heavier set white man in his 50's with light colored hair, come out of the vehicle, remove batteries from various trucks, and place them in the bed of the Ford Ranger.

B. INCIDENT OF JUNE 18, 2012

Tony Lander is associated with L&B Transportation Group (hereinafter "L&B"). On June 18, 2012, there was a theft of four batteries and 16 other batteries required servicing in five trucks for a total loss to the company of $2,412.13.

C. INCIDENTS OF JULY 1 AND JULY 16, 2012

On July 1, 2012, four batteries were stolen from one of L&B's trucks for a loss of $816. Then on July 16, 2012, L&B had four more batteries stolen out of one truck for a total loss of $632.88.

D. INCIDENT OF JULY 17, 2012

According to Gary Hyatt, the owner of Hyatt Trucking, on July 17, 2012, the company had nine commercial batteries stolen from four of its trucks for a total loss of $1,201.05.[8] Hyatt testified that he personally knew Jerrolds because Jerrolds worked as a truck driver for him many years ago. Hyatt indicated that because of Jerrolds's experience as a truck driver he would know how batteries are situated in trucks, as all truck drivers know that information. Additionally, Hyatt claimed that based on Jerrolds's experience, Jerrolds would know when the trucks were parked, when the trucks were being used, and the down times for the trucks.

---

[6] Kerry Transport is a "just in time" transport business. As a result, it alleged that the theft of the batteries, which resulted in a slowdown of the business, cost it money, and jeopardized its business.

[7] In the trial transcripts, the vehicles the batteries were taken from are referred to as "semi trucks," "semi tractors," "tractors," and "trucks." As the specific vehicle type is not pertinent to this appeal, the vehicles will be referred to as trucks.

[8] Hyatt testified that there were four incidents of batteries being stolen. However, he was only questioned about a single incident.

### E.  INCIDENTS OF AUGUST 7 AND AUGUST 12, 2012

On August 7, 2012, L&B had eight batteries stolen from two trucks for a total loss of $2,190.59.  Paul Schweigert worked as a truck driver for Redline Trucking Company in Buena Vista Township.  On the afternoon of Sunday, August 12, 2012, as he was coming into work, a black Ford Ranger passed him going very quickly in the opposite direction.  Schweigert then saw approximately five trucks with their battery box lids sitting on the floor, and discovered that eight batteries had been stolen.  Schweigert was not aware of anyone who worked for Redline Trucking Company who drove a similar vehicle.  Schweigert described the driver of the black Ford Ranger as a white, heavyset man, possibly in his 50's.  Upon discovering the theft, Schweigert called Diane Goode, the safety manager for Redline.  Goode testified that the loss related to the battery theft on that date was $912.

### F.  INCIDENTS OF AUGUST 26, 2012

Officer Hendricks also responded to a report of truck battery theft on Sunday, August 26, 2012 at TCI Tire.  When he arrived, Officer Hendricks spoke with the manager of the company, Dave Obendorffer, and found that there were four batteries stolen out of one truck.  Officer Hendricks viewed surveillance video of the property and again saw a black extended cab Ford Ranger with silver over the front tires enter the property.

According to Robert Fowler, the branch manager of Star Truck Rentals, which leases space to Country Fresh, Country Fresh also had a theft of batteries on August 26, 2012.  In Fowler's opinion, in order to gain access to the batteries on that date, the perpetrator used bolt cutters to cut the outside tie downs.

### G.  INCIDENT OF SEPTEMBER 2 AND SEPTEMBER 3, 2012

On September 3, 2012, Doyle of Kerry Transport discovered additional battery theft after observing battery covers lying on the ground near several trucks.  On this occasion, 16 batteries were removed from four trucks.  The total loss suffered was $3,063.38.  Video taken of that incident showed what appeared to be the same person driving the same Ford Ranger as in the May 13, 2012 incident.

### H.  INCIDENT OF SEPTEMBER 15, 2012

On Sunday, September 15, 2012, truck driver, Curtis Cody, was sitting in his parked truck watching television when the power went out.  When Cody got out of the truck, he saw three of his four batteries sitting on the ground by his truck, and the fourth battery was disconnected.  He also saw a white man in his mid-50's, who was Cody's height, climbing off of the back of his truck.  He later identified this individual as Jerrolds.  When Cody asked Jerrolds what he was doing on his truck, Jerrolds replied that he was taking "the batteries out of his buddy's truck."  When Cody informed Jerrolds that the truck belonged to him, Jerrolds jumped off of the truck and started running toward a dark colored extended cab Ford Ranger.  Cody was

so upset that he swung his tire thumper, which is used to check tire pressure, and struck Jerrolds's truck, leaving a dent in the driver's side of the vehicle just above the tire.[9]

## I.  INCIDENT OF SEPTEMBER 16, 2012

Gordon Lewis is a truck driver that owns Lewis Trucking.  On Sunday, September 16, 2012, one of Lewis's trucks was parked at a Speedway gas station in Bridgeport Township and had been parked there for a few nights.  The truck was secured and the cab locked.  When Lewis returned to the truck that day, four batteries had been stolen and the connectors were missing. The total loss suffered was approximately $800.

## J.  INCIDENT OF SEPTEMBER 23, 2012

On September 23, 2012, David Summer had contact with Jerrolds, who he knows as "Tony."  At that time, Summer had known Jerrolds, who he testified has a very distinctive walk and drove a black extended cab Ford Ranger with a different colored bed and the trim missing from the rear wheel area, for approximately six months.  On September 23, 2012, Summer bought two batteries from Jerrolds at a price of $40 each.  According to Summer, at the time, Jerrolds had other batteries in the bed of his truck and also had "whips," which are used to connect batteries together.  At trial, Summer identified Jerrolds in one of the surveillance videos based on his walk.

At some point, Summer came in contact with Detective Sergeant Greg Klecker in Buena Vista Township and told him about his purchase of two batteries from Jerrolds.  Summer provided the batteries to Detective Sergeant Klecker and, with the permission of the prosecutor, they were eventually returned to their identified owner, Doyle of Kerry Transport.

## K.  INCIDENTS OF SEPTEMBER 30 AND OCTOBER 7, 2012

L&B experienced theft of commercial batteries again on September 30, 2012.  On that date, 16 batteries were stolen from four trucks for a total loss of $4,403.50.  A surveillance video taken showed a white or Hispanic man, with a stocky build, a protruding stomach, and a unique walk, exit a Ford Ranger extended cab truck and take batteries out of several trucks.  The Ford Ranger was described as having wheel coverings on the front wheels, but not on the back, and chrome rims.  The incident was reported to the Saginaw County Sheriff's Office.  Detective Jeffrey Kruszka responded and viewed the surveillance video.

L&B had a further incident of battery theft on October 7, 2012, in which eight batteries were stolen from two trucks and involved what appeared to be the same Ford Ranger.  The total loss that day was $1,268.80.  Officer Shawntina Austin responded to L&B's report of theft and testified that there was also a report of a similar incident of theft that day by Nash Finch, which is located across from L&B.

---

[9] This Court would note that testimony was elicited at trial that Cody was unable to pick Jerrolds out of a photographic lineup prepared by the police.

-4-

## L.  INCIDENTS OF OCTOBER 28, 2012

Because of the ongoing issues with commercial battery thefts in the area, Officer Hendricks surveyed businesses on Sunday, October 28, 2012.  When he visited Star Truck Rental, Officer Hendricks found covers removed from batteries, severed anchor bolts, jumper cables lying on the ground, and a total of 16 batteries missing from five trucks.  He also surveyed Country Fresh, which shares a lot with Star Truck Rental, and found battery covers removed, severed anchor bolts, and that four batteries were stolen from two trucks.  The cost of the loss to Star Truck Rental was $1,229.66, and the cost of the loss to Country Fresh was $326.20.

## M.  INCIDENT OF NOVEMBER 2 AND 3, 2012

On the morning of Sunday, November 3, 2012, Doyle of Kerry Transport discovered another incident of commercial battery theft.  On this occasion, 20 batteries were stolen from five trucks for a total loss of $6,656.35.

## N.  ARREST OF JERROLDS AND RETURN OF PROPERTY

On Sunday, December 9, 2012, Officer Hendricks was patrolling near Wieland Idealease Trucking when he saw a black extended cab Ford Ranger with silver wheel flares over the front wheels and a dark burgundy colored bed.  The vehicle was similar to the vehicle that was seen related to several commercial battery thefts that Officer Hendricks had been dispatched to.  The driver of the vehicle was Jerrolds, who Officer Hendricks described as a heavier set white male in his 50's, with grayish hair.  There was no one else in the vehicle.  According to Officer Hendricks, the description of the driver was consistent with video and previous descriptions that Officer Hendricks had received of the larceny suspect.  As a result, Officer Hendricks stopped the vehicle.  Upon approaching the vehicle, Officer Hendricks saw two used batteries and several jumper terminals in the truck's bed.  He also observed a dent similar to one that was made to the suspect's truck based on one of the 2012 theft reports.  Inside of the vehicle, in plain view, Officer Hendricks saw a socket wrench, a crescent wrench, pliers with wire cutters, needle nose pliers, two pipe wrenches, a flashlight, screw drivers, bolt cutters, leather gloves, and an anchor bolt.

Officer Hendricks arrested Jerrolds and seized the items contained in the truck.  When Officer Hendricks ran the license plate of the vehicle that Jerrolds was driving, the Law Enforcement Information Network ("LEIN") system indicated that the license plate had been stolen.  Based on the vehicle identification number for the truck, the vehicle, which was a 1997 Ford Ranger, was registered to Ronald Garver of Gladwin, Michigan.[10]  The LEIN system also indicated that Jerrolds's driver's license had expired in 2008.  Officer Hendricks took Jerrolds to the Buena Vista police station and left him with Detective Sergeant Sean Waterman.  An expert in tool marks compared the bolt cutters recovered from Jerrolds's vehicle to evidence recovered

---

[10] It is unclear from the record whether the LEIN system was checked before or after Jerrolds was arrested.

during the six month investigation of battery thefts and found that the tool marks for the bolt cutters matched some of that evidence.

Andrew McBride, the owner of Diamond Batteries, has known Jerrolds (who he knows as "Tony") for many years. McBride testified that he bought approximately 40 scrap batteries from Jerrolds over four occasions in 2012, and last saw Jerrolds in October 2012. McBride buys automotive batteries for $11 each and commercial batteries for $16.50 each.

Overall, it was estimated that in six months, approximately 100 batteries, with a total value of $16,757, without labor, were stolen. According to Detective Sergeant Klecker, since Jerrolds's incarceration, there were no further complaints made of commercial battery theft.

## II. RESTITUTION

On appeal, Jerrolds first argues that the trial court erred when it ordered that restitution of $13,094 be paid to Doyle, and that remand for a hearing on restitution is required. We disagree. "For an issue to be preserved for appellate review, it must be raised, addressed, and decided by the lower court."[11] While Jerrolds objected to the trial court's order of restitution, he did not challenge the amount ordered. As such, this issue is unpreserved. Accordingly, "we will review this unpreserved nonconstitutional issue for plain error affecting [Jerrolds's] substantial rights."[12]

Restitution is defined as "[c]ompensation or reparation for the loss caused to another."[13] Crime victims have a right to restitution under the Michigan constitution and the Crime Victim's Rights Act ("CVRA")[14].[15]

> The CVRA provides that if a felony (or a misdemeanor punishable by imprisonment for more than one year) results in the loss of a victim's property, the trial court may order the defendant to pay to the victim, as restitution, the value of the property that was lost. Restitution encompasses only those losses that are easily ascertained and are a direct result of a defendant's criminal conduct. The prosecution must prove the amount of the victim's loss by a preponderance of the evidence.[16]

Here, Doyle testified at trial and at resentencing that the total loss to Terry Transport for the three incidents was $13,930.94. At trial, that amount was supported by documentation and

---

[11] *People v Metamora Water Serv, Inc*, 276 Mich App 376, 382; 741 NW2d 61 (2007).

[12] *People v Newton*, 257 Mich App 61, 68; 665 NW2d 504 (2003).

[13] *People v Gubachy*, 272 Mich App 706, 708; 728 NW2d 891 (2006) (citation and quotations omitted).

[14] MCL 780.751 et seq.

[15] *Gubachy*, 272 Mich App at 708.

[16] *Id*. (citations omitted).

-6-

based on Doyle's trial testimony, included labor. Jerrolds asserts that the amount of restitution ordered was improper because labor was included. Jerrolds, however, has failed to provide any support for his assertion. In fact, this Court has specifically held that labor costs can be included when determining the value of lost property and in replacing the lost property.[17] The cost of labor in the instant case was a direct result of Jerrolds's criminal conduct.[18] As such, there was no plain error by the trial court.

### III. INSUFFICIENT EVIDENCE

Jerrolds next claims that there was insufficient evidence regarding the identity of the suspect to support his convictions. We disagree.

We review claims regarding the sufficiency of the evidence de novo.[19] "In reviewing the sufficiency of the evidence, this Court must view the evidence in the light most favorable to the prosecution and determine whether a rational trier of fact could find that the essential elements of the crime were proved beyond a reasonable doubt."[20] Because "[j]uries, and not appellate courts, hear the testimony of witnesses; . . . we defer to the credibility assessments made by a jury."[21] "[I]t is well settled that identity is an element of every offense,"[22] so it must be proved beyond a reasonable doubt.

Here, there was significant testimony and video evidence presented at trial to support that an individual matching Jerrolds's physical description and driving a vehicle that Jerrolds was known to drive committed multiple instances of commercial battery theft and that he possessed certain items that could be construed as burglar's tools at the time of his arrest.[23] "[W]e will not interfere with the jury's determinations regarding the weight of the evidence and the credibility of the witnesses."[24] As such, Jerrolds's argument must fail.[25]

---

[17] See *id*. at 709-714.

[18] See *id*. at 708.

[19] *People v Henderson*, 306 Mich App 1, 8; 854 NW2d 234 (2014).

[20] *Id*. at 9.

[21] *Id*.

[22] *People v Yost*, 278 Mich App 341, 356; 749 NW2d 753 (2008).

[23] MCL 750.116; MCL 750.356(3)(a).

[24] *People v Unger*, 278 Mich App 210, 222; 749 NW2d 272 (2008).

[25] While only referenced in passing in Jerrolds's briefs filed pursuant to Administrative Order No. 2004-6, Standard 4, we also find that based on the record evidence there was sufficient evidence to satisfy the other elements of the crimes. MCL 750.116; MCL 750.356(3)(a). Jerrolds also seemingly challenges whether the tool mark expert was qualified to testify as an expert at trial. Even if we were exclude such testimony, there was sufficient evidence presented to demonstrate that Jerrolds was guilty of the crimes.

## IV. DEFECTIVE COMPLAINT AND ARRAIGNMENT

Jerrold raises several arguments in briefs filed pursuant to Administrative Order No. 2004-6, Standard 4; the first argument being that the trial court lacked subject-matter jurisdiction because the complaint was defective. We disagree. "Whether a court has subject-matter jurisdiction is a question of law subject to review de novo."[26]

Jerrolds argues that the felony complaint was defective because: Detective Sergeant Klecker was listed as both the complainant and complaining witnesses when he was not a victim; it did not list the specific dates, times, or locations of the offenses; it did not indicate how Detective Sergeant Klecker became aware of the information; it did not contain a proof of service; it did not have signed statements or sworn affidavits attached; and the prosecutor's signature was illegible. Jerrolds also claims that the felony complaint improperly "join[ed] charges into one charge." Jerrolds has failed to provide any support for his assertion that the above-alleged deficiencies would result in the trial court lacking subject-matter jurisdiction. "It is not enough for an appellant in his brief simply to announce a position or assert an error and then leave it up to this Court to discover and rationalize the basis for his claims . . . ."[27] Additionally, our review of the felony complaint reveals that the requisite statutory requirements were met.[28]

Jerrolds also claims that the trial court lacked subject-matter jurisdiction because he was not arraigned, did not waive arraignment, did not have counsel at his arraignment, and was bound over to the circuit court without bail being set. We disagree. According to the record evidence, Jerrolds was properly arraigned on February 14, 2013, defense counsel was appointed that day, and bond was set at $15,000. Additionally, "the circuit court obtained jurisdiction when the magistrate filed a return with the circuit court on . . . the charges [in the complaint] following the preliminary examination."[29] Thus, Jerrolds's arguments regarding subject-matter jurisdiction lack merit.

## V. SENTENCE AS A FOURTH HABITUAL OFFENDER

Jerrolds next asserts that the trial court erred when it sentenced him as a fourth habitual offender. We disagree. We review this unpreserved sentencing issue for plain error affecting Jerrolds's substantial rights.[30]

Specifically, Jerrolds claims that he did not receive sufficient notice that the prosecution was seeking an enhancement of his sentence. Pursuant to the applicable statute:

---

[26] *Davis v Dep't of Corrections*, 251 Mich App 372, 374; 651 NW2d 486 (2002).

[27] *People v Waclawski*, 286 Mich App 634, 679; 780 NW2d 321 (2009) (citation and quotations omitted).

[28] MCR 6.101; MCL 764.1a; MCL 764.1d. Jerrolds also claims that the trial court lacked subject-matter jurisdiction because the warrant, felony information, and examination return were not properly completed; however, our review of those documents reveals no errors.

[29] *People v McGee*, 258 Mich App 683, 690; 672 NW2d 191 (2003).

[30] *People v Carines*, 460 Mich 750, 763; 597 NW2d 130 (1999).

[T]he prosecuting attorney may seek to enhance the sentence of the defendant . . . by filing a written notice of his or her intent to do so within 21 days after the defendant's arraignment on the information charging the underlying offense or, if arraignment is waived, within 21 days after the filing of the information charging the underlying offense.[31]

Here, Jerrolds was arraigned on February 14, 2013. The notice that a fourth habitual offender enhancement was being sought was served on defense counsel on May 6, 2013. While service was more than 21 days after Jerrolds's arraignment, it was well before August 2013 trial and contrary to Jerrolds's assertion, defense counsel specifically acknowledged Jerrolds's habitual offender status at a May 28, 2013 hearing. As such, Jerrolds has failed to demonstrate plain error affecting his substantial rights. Thus, relief is not warranted.

## VI. INEFFECTIVE ASSISTANCE OF COUNSEL

Jerrolds also makes numerous claims of ineffective assistance of counsel, all of which we find lack merit. These issues are unpreserved, so "[o]ur review is limited to mistakes apparent from the record."[32]

To demonstrate a claim of ineffective assistance, a defendant must prove:

(1) that counsel's performance was deficient in that it fell below an objective standard of professional reasonableness and (2) that there is a reasonable probability that the outcome of the trial would have been different but for counsel's performance. There is a presumption of effective assistance of counsel, and the burden is on defendant to prove otherwise. An appellate court should neither substitute [its] judgment for that of counsel on matters of trial strategy, nor . . . use the benefit of hindsight when assessing counsel's competence.[33]

Jerrolds first claims that trial counsel was ineffective for failing to object to the bolt cutters and socket wrench being entered as evidence at trial. Even if this Court were to assume that the items should not have been entered as evidence, which it is not conceding, there was significant evidence linking Jerrolds to the incidents of theft and other purported burglar's tools seized and admitted at trial. As such, Jerrolds has failed to demonstrate that but for the alleged error by trial counsel, the outcome of the proceedings would have been different.

Jerrolds next asserts that trial counsel was ineffective for refusing, on the record, to contact multiple witnesses and refusing to call such witnesses at trial. "[T]he failure to call witnesses only constitutes ineffective assistance of counsel if it deprives the defendant of a substantial defense."[34] "The failure to make an adequate investigation is ineffective assistance of

---

[31] MCL 769.13(1).

[32] *People v Roscoe*, 303 Mich App 633, 643; 846 NW2d 402 (2014) (citation and internal quotation marks omitted).

[33] *Id*. at 643-644 (citations and internal quotation marks omitted).

[34] *People v Dixon*, 263 Mich App 393, 398; 688 NW2d 308 (2004).

counsel if it undermines confidence in the trial's outcome."[35] First, there is nothing in the record to support Jerrolds's claims. Also, in regards to Jerrolds's argument that the registered owner of the truck, Garver, should have been called as a witnesses to testify about who else Garver permitted to drive the truck, Jerrolds does not indicate whom he believes this other person was. Jerrolds also argues that "Trooper Escott" should have been called as a witness to testify that Cody was unable to provide a description of the suspect he encountered at the time of the incident. Cody, however, did testify that he could not describe the suspect's facial features. Next, Jerrolds claims that individuals, including his doctor, should have been called as witnesses to testify regarding his appearance at the time of the incidents to show that he was not the person in the surveillance videos. The jury, however, was provided with Jerrolds's mug shot at the time of his arrest. As such, failure to call those witnesses did not deprive Jerrolds of a substantial defense. Jerrolds further asserts that counsel was ineffective for failing to present evidence to impeach Summer who allegedly advised police that he also has seen Jerrolds drive a blue van. Jerrolds, however, is unable to prove that but for that error, he would have been acquitted.

Jerrolds also argues that trial counsel was ineffective for permitting a biased juror to remain on the jury. "Jurors are presumptively competent and impartial . . . ."[36] Here, the wife of a state trooper was permitted to stay on the jury. During voir dire, the potential juror indicated that her husband's job would not prevent her from being fair and impartial, and there is no evidence to suggest that information was false. Additionally,

> Perhaps the most important criteria in selecting a jury include a potential juror's facial expressions, body language, and manner of answering questions. However, as a reviewing court, we cannot see the jurors or listen to their answers to voir dire questions. For this reason, this Court has been disinclined to find ineffective assistance of counsel on the basis of an attorney's failure to challenge a juror.[37]

"We will not substitute our judgment for that of defendant's counsel, nor will we use the benefit of hindsight to assess counsel's performance," so relief is not warranted.[38]

Jerrolds further claims that trial counsel was ineffective for failing to object to Detective Sergeant Klecker's statement that there have been no thefts since Jerrolds's arrest, which Jerrolds believes told the jury that he has been incarcerated since he was arrested. Detective Sergeant Klecker's statement, however, did not undermine Jerrolds's presumption of innocence so as to warrant reversal.[39]

---

[35] *People v Grant*, 470 Mich 477, 493; 684 NW2d 686 (2004).

[36] *People v Johnson*, 245 Mich App 243, 256; 631 NW2d 1 (2001).

[37] *Unger*, 278 Mich App at 258 (citations and internal quotation marks omitted).

[38] *Id*.

[39] Cf. *People v Banks*, 249 Mich App 247, 258-259; 642 NW2d 351 (2002). Additionally, contrary to Jerrolds's assertion, trial counsel did advise the jury during his opening statement, which we acknowledge is not evidence, that the crime spree stopped when the case began to receive media attention.

Jerrolds also argues that trial counsel was ineffective for advising the jury during his opening statement that Jerrolds should not be found guilty of anything more than possessing stolen property, which showed that he was involved in the incidents related to the instant case. Jerrolds also claims that trial counsel implied during his closing argument that McBride was a criminal who Jerrolds was affiliated with by stating that he ran a "loosey goosey business." Since trial counsel was aware that two individuals who purchased commercial batteries from Jerrolds would likely testify at trial, and that two of those batteries were determined to be stolen, Jerrolds has failed to rebut the presumption that trial counsel's statements was sound trial strategy.

Jerrolds further asserts that trial counsel was ineffective for not requesting a hearing pursuant to *United States v Wade*[40] after Cody was unable to describe him after the incident or pick him out of a photographic lineup, but later identified him in court. "Where the risk of a tainted in-court identification is alleged, [a *Wade* hearing] is a useful tool to aid the trial court's determination of whether an independent basis for that identification exists."[41] However, when the issue of identification is not a close issue, failing to hold such a hearing would not constitute reversible error.[42] Here, when Cody was questioned by police after the incident, he provided police with a physical description of the suspect. Although Cody could not pick Jerrolds out of a photographic lineup or describe the suspect's facial features to police, he testified that he was certain that Jerrolds was the assailant because he was two feet away from him at the time of the incident. He also testified that his identification of Jerrolds was not based on Jerrolds being the defendant in the instant case. As a result, the identification of Jerrolds as the person who removed the batteries from Cody's truck was not a close call. Thus, a request for a *Wade* hearing would have been futile. Jerrolds also claims that trial counsel should have filed a motion to prevent Cody from testifying and identifying Jerrolds in court. Jerrolds, however, failed to provide a valid reason why Cody should have been prevented from testifying. "Failing to advance a meritless argument or raise a futile objection does not constitute ineffective assistance of counsel."[43] Based on the above, trial counsel was effective.

## VII. PROSECUTORIAL MISCONDUCT

Jerrolds also makes several unpreserved claims of prosecutorial misconduct. We find that they all lack merit. "[A] defendant's unpreserved claims of prosecutorial misconduct are reviewed for plain error. In order to avoid forfeiture of an unpreserved claim, the defendant must demonstrate plain error that was outcome determinative."[44]

First, Jerrolds alleges several improper statements were made during the prosecution's closing argument. "Generally, prosecutors are accorded great latitude regarding their arguments, and are free to argue the evidence and all reasonable inferences from the evidence as they relate

---

[40] 388 US 218; 87 S Ct 1926; 18 L Ed 2d 1149 (1967).

[41] *People v Baker*, 103 Mich App 255, 258; 303 NW2d 14 (1981).

[42] See *id*.

[43] *People v Ericksen*, 288 Mich App 192, 201; 793 NW2d 120 (2010).

[44] *People v Watson*, 245 Mich App 572, 586; 629 NW2d 411 (2001) (citation omitted).

to their theory of the case."[45]   Here, a review of the record reveals that such statements were merely a recitation of the evidence presented at trial, so there was no error.

Jerrolds also claims error because the officers staged some of the photographs of the evidence that was seized from the Ford Ranger he was driving at the time he was arrested. Again, Jerrolds has not alleged why this fact would warrant reversal and it is not for this Court "to discover and rationalize the basis for his claims."[46]

Next, Jerrolds asserts that the prosecution knowingly allowed false testimony.  Jerrolds first argues that Officer Hendricks testified falsely that he found a battery tie down in Jerrolds's truck when he stopped him on December 9, 2012, but no picture of the tie down was shown at trial.  He also claims that Officer Hendricks testified falsely that a dent in Jerrolds's vehicle alerted him to the fact that the vehicle may be the suspect vehicle from the series of thefts because law enforcement did not learn about the damage to the suspect vehicle until after Jerrolds was arrested.  Assuming arguendo that Jerrolds's allegations are true, we find that such testimony did not affect the outcome of the proceedings, as there was a significant amount of other evidence linking Jerrolds to the crimes.  Jerrolds also claims that two witnesses testified to seeing enlarged photographs of Jerrolds, but the officers who testified indicated that they did not show enlarged photographs to those witnesses.  Jerrolds, however, has failed to demonstrate that other members of law enforcement who did not testify did not show the enlarged photographs to the witnesses; and, thus, that a false statement was made.  As such, reversal is not warranted.

## VIII.  ILLEGAL SEARCH

Lastly, Jerrolds claims that the search of the Ford Ranger was illegal.  We disagree.  This unpreserved constitutional issue is reviewed for plain error.[47]

"An investigative stop, or *Terry*[48] stop, is permissible under the Fourth Amendment 'if the officer has a reasonable, articulable suspicion that criminal activity is afoot.' "[49]   Here, Jerrolds, who matched the description of the suspect, was seen driving a vehicle that matched the description of the suspect vehicle in a series of commercial battery thefts.  Thus, under the totality of the circumstances, the investigative stop was proper.  The items seized from the vehicle, which were "obviously incriminatory" under the circumstances of this case, were in plain view and, as such, fell within the plain view exception of the warrant requirement.[50] Accordingly, Jerrolds's argument must fail.[51]

---

[45] *People v Seals*, 285 Mich App 1, 22; 776 NW2d 314 (2009).

[46] *Waclawski*, 286 Mich App at 679.

[47] *People v Vaughn*, 491 Mich 642, 664; 821 NW2d 288 (2012).

[48] *Terry v Ohio*, 392 US 1; 88 S Ct 1868; 20 L Ed 2d 889 (1968).

[49] *People v Collins*, 298 Mich App 458, 467; 828 NW2d 392 (2012) (citation omitted).

[50] *People v Galloway*, 259 Mich App 634, 639; 675 NW2d 883 (2003).

[51] To the extent that Jerrolds is also arguing that trial counsel's failure to move to exclude the evidence seized from the vehicle constituted ineffective assistance of counsel, because trial

Affirmed.

/s/ Michael J. Talbot
/s/ Mark J. Cavanagh
/s/ Michael J. Kelly

---

counsel is not required to raise a meritless argument, this argument must fail. *Ericksen*, 288 Mich App at 201.