PEOPLE v BANKS

Docket No. 225052. Submitted August 8, 2001, at Grand Rapids. Decided January 15, 2002, at 9:20 A.M. Leave to appeal sought.

Derrek S. Banks was convicted by a jury in the Kent Circuit Court, Dennis C. Kolenda, J., of armed robbery, conspiracy to commit armed robbery, and possession of a firearm during the commission of a felony. The defendant appealed.

The Court of Appeals *held*:

1. The trial court did not abuse its discretion in denying the defendant's motion for a mistrial based on the prosecution's discovery violation in inadvertently not providing the defense with a copy of a police report of an interview of the victim in which the victim told the police that he saw his attackers remove their ski masks. The existence of the police report became known to the defense after the victim finished testifying and after the defense's cross-examination of the victim focused in large part on the discrepancy between the victim's preliminary examination testimony, in which the victim said nothing about his attackers removing their masks, and the victim's trial testimony, in which the victim said he told the police he saw his attackers remove their masks. Contrary to the defendant's contention, his credibility and case were not completely destroyed by the discovery violation. Discrepancies between the victim's testimony during preliminary examination and the trial existed despite what was contained in the police report. The defendant was able to explore those discrepancies at length. The discovery violation did not render the trial fundamentally unfair because the police report was not evidence favorable to the defendant, nor was it material.

2. The trial court abused its discretion in denying the defendant's request that his alibi witness, who at the time of trial was a prisoner, be allowed to testify without being handcuffed. The trial court denied the defendant's request merely on the basis of the preference of the officer who brought the witness to court that the witness remain handcuffed. The trial court should have considered, but did not, whether handcuffing was necessary to prevent the escape of the witness, to prevent the witness from injuring others in the courtroom, or to maintain an orderly trial. The erroneous

handcuffing of the witness, a nonconstitutional error, was outcome determinative and requires the reversal of the defendant's convictions. The credibility of the witness, which was adversely affected by the handcuffing, was crucial to the defendant's case.

Reversed and remanded for a new trial.

1. Criminal Law — Discovery — Discovery Violations.

A trial court exercising its discretion in fashioning a remedy for a discovery violation must balance the interests of the courts, the public, and the parties.

2. Criminal Law — Discovery — Duty of Prosecution.

The prosecution does not have a constitutional duty to provide defense counsel with unlimited discovery of everything known by the prosecutor; nevertheless, suppression by the prosecution of evidence requested by, and favorable to, an accused violates due process where the evidence is material to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution.

3. Criminal Law — Trial — Defense Witnesses — Handcuffs and Other Restraints.

A trial court abuses its discretion in controlling the course of a trial and infringes the defendant's right to a fair trial in ordering a prisoner appearing before the jury as the defendant's alibi witness to remain handcuffed or otherwise restrained while testifying without first determining whether such restraint is necessary to prevent the escape of the witness, to prevent the witness from injuring others in the courtroom, or to maintain an orderly trial.

*Jennifer M. Granholm*, Attorney General, *Thomas L. Casey*, Solicitor General, *William A. Forsyth*, Prosecuting Attorney, and *Vicki L. Seidl*, Assistant Prosecuting Attorney, for the people.

State Appellate Defender (by *Deborah Winfrey Keene*), for the defendant on appeal.

Before: Holbrook, Jr., P.J., and Cavanagh and Meter, JJ.

Per Curiam. Defendant appeals as of right from his jury trial convictions of armed robbery, MCL 750.529, conspiracy to commit armed robbery, MCL 750.157a,

and possession of a firearm during the commission of a felony (felony-firearm), MCL 750.227b. Defendant was sentenced to two years' imprisonment for the felony-firearm conviction, and consecutive to that, two concurrent terms of twelve to forty years for the armed robbery and conspiracy convictions. We reverse and remand.

At around 3:00 A.M. on July 27, 1999, Donavan Ferron was talking and drinking beer with friends on the street in front of a house in Grand Rapids. At some point, two men wearing ski masks and carrying guns ran toward Ferron and attacked him. Ferron stated that one of his attackers was short, fat, and "darkskinned," and the other was tall, thin, and "brownskinned." When the shorter of the two attackers put a gun to Ferron's head, a struggle ensued between Ferron and the man for possession of the gun. The taller of the two attackers then struck Ferron on the back of the head with a gun. As Ferron lay on the ground, the taller attacker ripped off Ferron's necklace and grabbed his wallet and gym shoes. Ferron testified at trial that he saw his two attackers flee to a Bronco, take off their masks, and then go into a nearby house. Ferron was able to identify defendant at trial as the taller of his two attackers.

Defendant's cross-examination of Ferron focused in large part on apparent discrepancies between Ferron's preliminary examination testimony and trial testimony with regard to what Ferron observed after he was attacked. Ferron testified during the preliminary examination that the only thing he knew about his attackers' flight was that "they went back into the darkness." Ferron had not testified during the preliminary examination that he had seen his attackers

remove their masks, nor had he testified that he had seen the two enter a nearby residence. When asked by defense counsel if he had ever told anyone about seeing his attackers without their masks, Ferron replied that he had told the investigating detective. "I told him I saw them when—I saw them when they took the masks off. That's how I was able to identify them," Ferron testified.

It was not until Ferron's testimony was complete that defendant was first given a copy of the police report of the interview in which Ferron had told the police that he saw his attackers remove their masks. The prosecutor indicated that he too had not been given a copy of this report. Defendant then moved for a mistrial. Defense counsel argued that as a result of the discovery violation, he had lost all credibility in the eyes of the jury. The trial court denied defendant's motion. The court expressed sympathy for defense counsel, but concluded that the failure to turn over the report had been inadvertent. The court noted that discrepancies in Ferron's preliminary examination and trial testimony remained. The court presumed that given these discrepancies, defendant would likely have followed the same course during cross-examination even if the report had been previously disclosed. Noting that the failure to disclose might have affected defendant's consideration of a plea offer by the prosecution, the court gave defendant the night to reconsider his rejection of that offer. The next day, defendant again rejected the plea offer. The court also indicated that it would give a curative instruction addressing the circumstances surrounding the belated disclosure of the report. However, no curative instruction was given.

Paul Brown testified pursuant to a plea bargain. Brown admitted to being one of the two men who attacked and robbed Ferron. Brown testified that after the robbery, he and his cousin, Shomari Whiteside, left in Whiteside's truck. On cross-examination, Brown admitted having been "guessing" in his preliminary examination testimony when he stated that defendant left the scene in his own car. Grand Rapids Police Officer Matthew Dwyer testified that he was one of the officers who responded to the scene of the robbery. Dwyer testified that Ferron had stated that he had observed a Bronco with three people in it drive by before the robbery, and had seen the same vehicle drive by with one person in it after the robbery. Dwyer stated that Ferron had identified Whiteside as being the driver of the Bronco when it passed by before the robbery. Officer Case Weston testified that he found a ski mask inside Whiteside's Bronco.

Whiteside testified on behalf of defendant. At the time of trial, Whiteside was in prison for a parole violation. Over defendant's objections, Whiteside appeared in court in handcuffs. Whiteside testified that when he returned home at around 1:30 or 2:00 A.M., defendant approached him and asked for a ride. Whiteside testified that defendant was trying to get to a female friend who had just been released from the hospital. Whiteside agreed to give defendant a ride, but told him that Whiteside had to first stop to see Brown. When the two arrived at Brown's home, they were approached by police, questioned about the robbery, and ultimately arrested. Whiteside denied that a ski mask had been in his Bronco that night.

Defendant argues that the trial court erred in not granting his motion for a mistrial following the late

discovery of the police report. We agree with the trial court that a discovery violation occurred. Pursuant to MCR 6.201(B)(2), upon request, the prosecution must disclose "any police report concerning the case." Defendant made a request for such material, and the court ordered its production. We also agree that this discovery violation appears to have been inadvertent. The officer who wrote the report testified that he had assumed it had been turned over with all the other material he had. Defendant did not challenge this assertion below, nor does he challenge it now on appeal.

Therefore, the question before us is whether the trial court abused its discretion in denying defendant's motion for a mistrial based on this discovery violation. MCR 6.201(J); *People v Davie (After Remand)*, 225 Mich App 592, 597-598; 571 NW2d 229 (1997). We find no abuse of discretion. When determining the appropriate remedy for discovery violations, the trial court must balance the interests of the courts, the public, and the parties in light of all the relevant circumstances, including the reasons for noncompliance. *Davie, supra* at 598.

Defendant argues that the discovery violation was highly prejudicial in light of his strategy to impeach Ferron with his testimonial inconsistencies. Defendant asserts that he would have prepared for trial differently had the report been timely disclosed. We agree with defendant that his cross-examination of Ferron would likely have taken, in part, a different tack had he been in prior possession of the report. Most of the cross-examination focused on Ferron's failure to testify during the preliminary examination that he saw his attackers take off their ski masks.

However, at the end of this line of inquiry, defendant also posed the following questions concerning whether Ferron had ever told anybody about seeing his attackers without their masks:

Q: Did you ever tell anybody before today that you saw these people take their masks off?

A: Yeah.

Q: Who did you tell?

A: I told—I told my man right here, the detective.

Q: You told the detective?

A: Yeah. I told him I saw them when—I saw them when they took the masks off. That's how I was able to identify them.

Q: You saw these people take their masks off and you told that to the detective, right?

A: I just answered yes.

We believe that defendant would not have cross-examined Ferron this way had defendant been given this police report. There would be no reason for defendant to allow Ferron to fend off an attack to his credibility by giving him an uncontested opening to point to a prior consistent statement.

Defendant does not argue on appeal, however, that he would have abandoned his attempt to impeach Ferron with his testimonial inconsistencies had the police report been timely disclosed. Thus, the only change to defendant's trial strategy regarding Ferron would have been how he would handle the police report. Defendant would have had to decide whether he would introduce Ferron's version of events in the police report, or whether he would leave that to the prosecution.

Thus, we believe that contrary to defendant's assertion, his credibility and case were not completely

destroyed by the error. Discrepancies between Ferron's preliminary examination and trial testimony existed despite what was contained in the police report. Defendant was able to explore these discrepancies at length. Further, defendant's questioning regarding whether Ferron had ever told anyone he saw his attackers with their masks off was brief. We do not believe that confidence in the outcome of the trial was undermined by this singular event. See *Kyles v Whitley*, 514 US 419, 434; 115 S Ct 1555; 131 L Ed 2d 490 (1987); *United States v Bagley*, 473 US 667; 105 S Ct 3375; 87 L Ed 2d 481 (1985).

Further, we do not believe that the trial was rendered fundamentally unfair by the failure to disclose the report. While the prosecution is under a duty to disclose impeachment material that is favorable to a defendant, *Bagley*, *supra* at 676; *People v Brownridge*, 237 Mich App 210, 214; 602 NW2d 584 (1999), the prosecution is not under an affirmative duty to disclose material that supports its witness' testimony and thus undermines a charge of recent fabrication. "There is no general constitutional right to discovery in a criminal case." *Weatherford v Bursey*, 429 US 545, 559; 97 S Ct 837; 51 L Ed 2d 30 (1977); accord *United States v Argus*, 427 US 97, 106; 96 S Ct 2392; 49 L Ed 2d 342 (1976) (observing that the prosecution does not have a constitutional "duty to provide defense counsel with unlimited discovery of everything known by the prosecutor"). Nonetheless, pursuant to *Brady v Maryland*, 373 US 83, 87; 83 S Ct 1194; 10 L Ed 2d 215 (1963), "suppression by the prosecution of evidence [requested by and] favorable to an accused . . . violates due process where the evidence is material either to guilt or to punishment,

irrespective of the good faith or bad faith of the prosecution."

Although the United States Supreme Court has not specifically delineated the outlines of what constitutes "favorable evidence," we do not believe that the police report at issue here falls under this classification. Considered in a larger context, the report is more neutral than it is favorable or unfavorable to defendant. On one hand, the report supports Ferron's trial testimony because it rebuts a charge of recent fabrication. On the other hand, it can be used to show that Ferron's account of the events has shifted not once, but twice, i.e., between his statement to the police and the preliminary examination, and then again between the preliminary examination and the trial.

As previously noted, the real importance of this information to defendant is that had he known about it, his preparation for, and confrontation of, Ferron's trial testimony would have been slightly altered. However, we do not believe that even the most generous reading of the "favorable evidence" standard would require the prosecution to disclose evidence whose utility lay only in helping a defendant contour a portion of his cross-examination of a key state witness. See *Weatherford, supra* at 559-561.

Additionally, we conclude that this evidence does not meet the *Brady* requirement of materiality. We do not believe that had this evidence been disclosed, "there is a reasonable probability that . . . the result of the proceeding would have been different." *Bagley, supra* at 682.

Defendant also argues that the trial court erred in denying his request that Whiteside be allowed to tes-

tify without handcuffs. The state counters that the court acted within its discretion and that, if the court did err, defendant has failed to show that it is more probable than not that the error resulted in a miscarriage of justice. *People v Lukity*, 460 Mich 484, 494-495; 596 NW2d 607 (1999).

It is well settled in Michigan that a trial court has broad discretion in controlling the course of a trial. See *People v Gray*, 57 Mich App 289, 294; 225 NW2d 733 (1975). Included within this authority is the discretion to shackle a defendant during trial. *People v Dixon*, 217 Mich App 400, 404; 552 NW2d 663 (1996). The right of a defendant to appear at trial without any physical restraints is not absolute. Nonetheless, permitting a defendant to appear at a jury trial free from handcuffs or shackles is an important component of a fair trial, *People v Dunn*, 446 Mich 409, 426; 521 NW2d 255 (1994), because having a defendant appear before a jury handcuffed or shackled negatively affects the defendant's constitutionally guaranteed presumption of innocence, *id.* at 425, n 26 (observing that " '[t]he presumption of innocence requires the garb of innocence' " [quoting *Eaddy v People*, 115 Colo 488, 492; 174 P2d 717 (1946)]). The Sixth Amendment guarantee of the right to a fair trial means that "one accused of a crime is entitled to have his guilt or innocence determined solely on the basis of the evidence introduced at trial, and not on grounds of official suspicion, indictment, continued custody, or other circumstances not adduced as proof at trial." *Taylor v Kentucky*, 436 US 478, 485; 98 S Ct 1930; 56 L Ed 2d 468 (1978).

The question of a trial court's authority to handcuff or shackle a witness other than a defendant has not

been addressed in Michigan. Most courts, however, use the same standard of review for placing physical restraints on witnesses as they do for restraints on defendants.[1] We agree with the reasoning set forth in this line of cases. Accordingly, we hold that in Michigan the propriety of handcuffing or shackling a testifying witness is subject to the same analysis as that for defendants, i.e., the handcuffing or shackling of a witness during trial should be permitted only to prevent the escape of the witness, to prevent the witness from injuring others in the courtroom, or to maintain an orderly trial. We will review a trial court's decision to handcuff or shackle a witness for an abuse of discretion.

In the case at hand, there are no facts in the record to support the restraining of Whiteside. When defendant requested that Whiteside be allowed to testify without handcuffs, the following colloquy occurred between the court and the officer who brought Whiteside to court:

> *Court*: If you don't have concern for people's safety, Officer, I think fairness says we should take the handcuffs off. But, if you think that's a problem, let me know.
> *Officer*: I prefer to leave them on.

---

[1] See *McCall v State*, 2001 WL 1519744 (Ala Crim App, November 30, 2001); *Williams v State*, 629 P2d 54, 56 (Alas, 1981); *Tucker v State*, 336 Ark 244, 246-247; 983 SW2d 956 (1999); *People v Ceniceros*, 26 Cal App 4th 266, 277; 31 Cal Rptr 2d 303 (1994); *State v Canty*, 223 Conn 703, 719-720; 613 A2d 1287 (1992); *Jackson v State*, 698 So 2d 1299, 1303 (Fla App, 1997); *State v Mills*, 117 Idaho 534, 536; 789 P2d 530 (1990); *People v Sullivan*, 48 Ill App 3d 787, 792; 6 Ill Dec 462; 362 NE2d 1382 (1977); *Parker v State*, 567 NE2d 105, 110-111 (Ind App, 1991); *Commonwealth v Brown*, 364 Mass 471, 475; 305 NE2d 830 (1973); *State v Coursolle*, 255 Minn 384, 389; 97 NW2d 472 (1959); *State v Pendergrass*, 726 SW2d 831, 832 (Mo App, 1987); *State v Simmons*, 26 Wash App 917, 921; 614 P2d 1316 (1980); anno: *Right of accused to have his witnesses free from handcuffs, manacles, shackles, or the like*, 75 ALR2d 762 (1961).

*Court*: All right. We'll do that then.

The officer never testified that Whiteside posed a threat of escape or a threat to the security of others in the courtroom. Indeed, when the court indicated that safety would be a legitimate reason to handcuff Whiteside, the officer did not respond that this was the reason for the restraints. Nor is there evidence that physically restraining Whiteside was necessary to maintain order. The only justification offered was that the officer *preferred* that the handcuffs be left on. Absent a compelling reason for such a preference, a court must not handcuff or shackle a witness simply because someone, even a law enforcement officer, is so inclined. Accordingly, we conclude that the trial court abused its discretion when it ruled that Whiteside would testify while restrained by handcuffs.

The standard a reviewing court should apply when determining whether the erroneous handcuffing of a defense witness requires reversal is also an issue of first impression in Michigan. The standard to be applied turns on whether this error is considered constitutional or nonconstitutional.

"The right to a fair trial is a fundamental liberty secured by the Fourteenth Amendment. The presumption of innocence, although not articulated in the Constitution, is a basic component of a fair trial under our system of criminal justice." *Estelle v Williams*, 425 US 501, 503; 96 S Ct 1691; 48 L Ed 2d (1976) (citation omitted); accord *Coffin v United States*, 156 US 432, 453; 15 S Ct 394; 39 L Ed 481 (1895) ("The principle that there is a presumption of innocence in favor of the accused is the undoubted law, axiomatic and elementary, and its enforcement

lies at the foundation of the administration of our criminal law."). The real and substantial danger posed to the presumption of innocence by handcuffing or shackling a defendant at a criminal trial has been specifically recognized in Michigan. *Dunn, supra* at 425, n 26. Accordingly, any error in this regard would be of constitutional significance. *People v Ceniceros*, 26 Cal App 4th 266, 279-280; 31 Cal Rptr 2d 303 (1994).

However, we do not believe that the handcuffing or shackling of a defense witness also adversely and unfairly affects a criminal defendant's presumption of innocence, thereby undermining the fairness and impartiality of the trial. While handcuffs on a testifying witness other than a defendant sends the message to the jury that the court considers the witness to be untrustworthy and even dangerous, it does not send a concurrent suggestion that the defendant is a person predisposed to commit crimes or that the defendant is a dangerous person who cannot be trusted. On this point, we agree with the dicta found in *Kennedy v Cardwell*, 487 F2d 101, 106, n 5 (CA 6, 1973):

> The decision whether to shackle witnesses is left to the sound discretion of the trial judge. The reason underlying the rule is the inherent prejudice to the defendant since it is likely the jury will suspect the witness's credibility. The prejudice factor toward the defendant, although much less than the situation where the defendant is shackled, provides a valid point of comparison *even though the shackled witness cases do not directly affect the presumption of innocence.* [Emphasis added.]

"[A] preserved, nonconstitutional error is not a ground for reversal unless 'after an examination of the entire cause, it shall affirmatively appear' that it is more probable than not that the error was outcome

determinative." *Lukity, supra* at 496, quoting MCL 769.26. After reviewing the record, we conclude that this standard has been met in this case.

While a defendant's case may be properly attacked by challenging the credibility of the defendant's witnesses, absent a showing that the circumstances require handcuffing a defense witness, the fairness of the trial must not be undermined by destroying the credibility of a witness before the witness even gets the opportunity to testify. See, e.g., *United States v Esquer*, 459 F2d 431, 434 (CA 7, 1972) (observing that the handcuffing of a witness "is inconsistent with our basic concepts of justice and should be resorted to only in exceptional situations"). The message conveyed by physically restraining a witness has the distinct potential to be considered by the jury as "more informing than reams of cold record." *Ashcraft v Tennessee*, 322 US 143, 171; 64 S Ct 921; 88 L Ed 1192 (1944) (Jackson, J., dissenting).

The record shows that the credibility of the witnesses was crucial in this trial and that the credibility of Whiteside was crucial to defendant's case. Defendant's liberty depended, in large part, on the jury's evaluation of the credibility of the witnesses who appeared before it. See *Napue v Illinois*, 360 US 264, 269; 79 S Ct 1173; 3 L Ed 2d 1217 (1959) ("The jury's estimate of the truthfulness and reliability of a given witness may well be determinative of guilt or innocence . . . ."). Defendant's entire defense was premised on his having an alibi for the time Ferron was robbed. If the jury believed Whiteside, he would place defendant somewhere else at the time of the robbery. The lengths to which the prosecution addressed Whiteside's testimony in its rebuttal closing argument

indicates the importance of this testimony to the outcome of the case. Further, there is no evidence in the record that the court took precautions to minimize the effect of the jury's seeing the witness in handcuffs.

Under these circumstances, we conclude that it is more probable than not that the erroneous shackling of Whiteside during his testimony was outcome determinative. We are mindful that as an appellate court, we must not engage in a weighing of the credibility of the witnesses appearing at trial. Accordingly, when confronted with two conflicting stories regarding defendant's possible involvement in the crime, particularly stories presented by witnesses with apparent credibility concerns, we must be careful not to favor one account over the other. Absent compelling physical evidence or testimony by uncompromised witnesses, we cannot conclude that this error was harmless.

Reversed and remanded for a new trial. We do not retain jurisdiction.