*If this opinion indicates that it is "FOR PUBLICATION," it is subject to
revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee,

v

DERRICK CHRISTOPHER MCCANTS,

        Defendant-Appellant.

UNPUBLISHED
June 17, 2021

No.  351420
Hillsdale Circuit Court
LC No.  19-434529-FC

Before:  JANSEN, P.J., and M. J. KELLY and RONAYNE KRAUSE, JJ.

PER CURIAM.

Defendant, Derrick McCants, appeals by right his jury trial convictions of two counts of first-degree criminal sexual conduct, MCL 750.520b, torture, MCL 750.85, unlawful imprisonment, MCL 750.349b, assault with intent to rob while unarmed, MCL 750.88, assault with intent to commit great bodily harm less than murder, MCL 750.84, possession of methamphetamine, MCL 333.7403, and unlawful use of a motor vehicle, MCL 750.414.  Because there are no errors warranting reversal, we affirm.

## I.  BASIC FACTS

In early April 2019, James Sorensen, a 52-year-old New Hampshire man, decided to visit a friend in Hillsdale, Michigan.  After spending some time visiting his friend, Sorensen drove a new acquaintance to an apartment townhouse occupied by McCants.  Thereafter, from April 5 or 6, 2019 until April 11, 2019, he was held captive in that apartment by McCants.  During that time, he was threatened, beaten, sexually abused, and robbed.  He endured punches, kicks, and other physical abuse inflicted by McCants and by others acting on McCants's orders.  Sorensen was bound with duct tape multiple times.  His feet were stepped on, leaving them black and blue.  On one occasion, McCants punched him so hard in the face that the rocking chair Sorensen was sitting on was knocked over.  Thereafter, he remained unmoving on the floor for over a half an hour.

Some of the physical abuse was captured on a video recording that was taken using a cellular telephone McCants commandeered from the apartment owner.  The video depicted abuse that Sorensen described McCants inflicting upon him.  A police officer familiar with McCants's voice opined that the voice on the video belonged to McCants, and Sorensen identified McCants

-1-

as the person who burnt his hair with the torch. McCants's confederate, Erik Wist, also testified that he could smell McCants using the torch to burn Sorensen.

As a result of the physical abuse, Sorensen sustained multiple facial fractures, bruises to his hands and arms, and bruises on his feet. Wist testified that over time Sorensen's eye sockets were swollen, his nose was bleeding, his jaw was broken, and his teeth were bleeding. Sorensen's doctor testified that the facial fractures were "very significant," and that they could result in breathing difficulties, physical disfigurement, loss of sensation in the face, and potential vision loss. The doctor opined that the injuries were not all inflicted at the same time because of differences in the discoloration of his skin. The jury was shown a number of photographs depicting Sorensen's injuries.

While at the apartment, Sorensen was confined to a utility closet, forced to crawl on his hands and knees between the closet and McCants's room, and was made to shower with Wist. The last time he had to crawl between the closet and McCants bedroom, McCants told him that he was going to "slice your head up," "slice up your face," and that he was "gonna kill yah this time." He showed Sorensen a knife and held it against his cheek and his throat. McCants injected Sorensen with methamphetamine and told him that it would sterilize him so he would never have a sex drive again.[1]

Sorensen testified that he was threatened with physical abuse, explaining that on one occasion McCants held a hammer and threatened to cave in his skull with it. Wist recounted a separate incident with the hammer. He explained that McCants made Sorensen lay on his stomach with his arms to the side and his fingers splayed. McCants then struck the ground between Sorensen's fingers with the hammer, while he demanded to know where his money was and why Sorensen's credit cards were not working. McCants also told Sorensen that he had killed Sorensen's father and that Sorensen's mother was also going to be murdered.

After a number of days, Sorensen was driven to a field. Sorensen explained that at that time his jaw and skull had already been broken by McCants and Wist. McCants told him that he was going to die, that he should pick the place where it would happen, and then he was forced to walk around the field for what felt like 20 minutes.[2] He told Sorensen that his death would be slow and painful. He warned him to walk, stay in the field, not to run, not scream, and not try anything or he would really get hurt. Wist testified that he walked the field with Sorensen, so that Sorensen could pick his gravesite. Sorensen was afraid and kept saying that he did not want to die. Despite wanting to live, Sorensen admitted that he resigned himself to death. It did not happen, however, and he was taken back to the apartment.

---

[1] At trial, McCants introduced testimony that Sorensen was on the sex offender registry. Sorensen testified that McCants would take videos, saying "this is how we're gonna take care of registered sex offenders from now on." McCants suggested that Sorensen came to Michigan to purchase a five-year-old child, but Sorensen denied that allegation.

[2] Sorensen testified that McCants told him to get out the vehicle, saying "You're gonna die tonight. We couldn't get more money; you're gonna end up dying tonight."

At some point during Sorensen's confinement, McCants also ordered him to perform fellatio on him. Sorensen testified that it happened twice on the same day. The first time McCants told him "I have a gun. You do what I want or you're a dead man," and McCants held what felt like a gun to Sorensen's head while he performed fellatio on McCants. The second time did not involve a weapon, but Sorensen testified that he did it because he was intimidated by being told he was going to be killed or endure bodily harm. He explained that at that point he did what he had to do so that he "might survive."

Sorensen endured additional abuse. He was not fed. He was forced to clean his own blood from the utility closet. His yellow shirt turned orange from his bleeding over the course of his imprisonment. Sorensen was also robbed. He testified that McCants "took what he wanted and did what he wanted." His cash was taken from him and he was forced to make multiple purchases on his credit cards. The purchases were flagged by the credit card companies and his accounts were locked. McCants beat him more, demanding that Sorensen pay him $10,000. The keys to Sorensen's vehicle were taken from him on McCants's order. While Sorensen was held captive, his van was used by McCants and others without Sorensen's permission.

In particular, on April 11, 2019, before Sorensen was rescued, the police observed McCants driving the vehicle. Inside McCants and Wist's pockets, they found numerous credit cards and documents with Sorensen's name on them. In the back of the van was a pair of socks with what appeared to be blood on them. After Sorensen was rescued, the police found additional documentation with Sorensen's name on it in McCants's bedroom.

Related to the drug charges, the police discovered methamphetamine and drug paraphernalia in Sorensen's vehicle, which was being driven by McCants on April 11, 2019. Wist identified the drugs as belonging to McCants. There were also drugs and drug paraphernalia inside McCants's room.

## II. DEFENDANT IN SHACKLES

### A. STANDARD OF REVIEW

McCants argues that he was denied his constitutional right to a fair trial because some of the jurors saw him being shackled on the first day of the trial. McCants brought the issue to the trial court's attention following the lunch recess on the first day of trial. He stated:

> *McCants.* Your Honor, I just want the record to reflect that several juror—juror members, I guess you would call 'em, seen me bein' shackled and handcuffed and brought in and stuff like that. I just want the record to reflect just in case—in case it might influence something later on down the line that they might think because I'm in custody that I'm guilty. They might not. It might not affect anything, but nonetheless, I want it—I want the record to reflect.

> *The Court.* I don't know if they saw you or not, Mr. McCants.

> *McCants.* I was out with the Officers—well, when we came in, they were right out there. They looked right at us. Officer and Sergeant both—can all attest to that.

*The Court*. That may or may not be, sir. I know that the Sheriff's Department has been very careful to accommodate you. They're taken you down a back way in the courthouse and out of the courthouse that is not public. It's a closed staircase so the jury would not see you.

I can't guarantee what they may or may not see out in the parking lot after they've left. I mean, I let—I discharged them for lunch. You were held here for a short period of time—

*McCants*. This was on the way back, your Honor, I'm sorry.

*The Court*. Okay, either way. I mean, I can't guarantee that they may not see you out in public. I mean, we do whatever we can. You obviously are in custody. You're not sitting here in shackles. You're sitting in plain clothes; nicely dressed. We try to give every impression of non-bias; that you're not sitting in the county jail. If they see you come and go by accident because they're mingling out in the parking lot, I cannot guarantee that. I can't send deputies out in and clear a two-block radius just so that we can take you in and out, so, your record's clear. You've made your point.

\* \* \*

We'll just continue to do whatever we can to ensure that you get a fair trial.

Thereafter, the court asked McCants's lawyer if there was "anything else," and he responded, "No, your Honor." There was no request for an evidentiary hearing to determine whether any jurors actually saw McCants in shackles. Nor was there a request for any curative actions, such as a jury instruction designed to alleviate any prejudice caused by the possibility that some of the jurors may have seen McCants in shackles.

Generally, "[f]or an issue to be preserved for appellate review, it must be raised, addressed, and decided by the lower court." *People v Metamora Water Serv, Inc*, 276 Mich App 376, 382; 741 NW2d 61 (2007). Here, although the issue was certainly stated on the record, the court was not asked to take action or make any decision, consequently, we conclude that this issue is unpreserved.[3] We review unpreserved constitutional claims for plain error affecting the defendant's substantial rights. *People v Carines*, 460 Mich 750, 763-764; 597 NW2d 130 (1999). Under plain-error review, reversal is warranted only if the defendant can establish the following: (1) an error occurred; (2) that error was plain; and (3) that error affected the defendant's substantial rights. *Id*. at 763. "The third requirement generally requires a showing of prejudice, i.e., that the error affected the outcome of the lower court proceedings." *Id*. If the defendant successfully carries this burden, reversal is nevertheless only warranted if "the plain, forfeited error resulted in

---

[3] Stated differently, an issue is not preserved simply by a defendant announcing "for the record" what he believes may or may not be a defect in the trial proceedings and then leaving it entirely up to the trial court to discover and rationalize the basis for his claims and to sua sponte fashion a remedy.

the conviction of an actually innocent defendant or when an error seriously affected the fairness, integrity or public reputation of judicial proceedings independent of the defendant's innocence." *Id.* (quotation marks and citation omitted).

## B. ANALYSIS

Generally, a defendant's right to a fair trial includes "the right to be free of shackles or handcuffs in the courtroom." *People v Payne*, 285 Mich App 181, 186; 774 NW2d 714 (2009). Although "this right is not absolute, a defendant may be shackled only on a finding supported by record evidence that this is necessary to prevent escape, injury to persons in the courtroom or to maintain order." *Id.* (quotation marks and citation omitted). Here, McCants was not shackled while in the courtroom. Instead, some jurors allegedly saw him while he was being taken back to the courtroom following a lunch break. "[T]he prohibition against shackling does not extend to safety precautions taken by officers while transporting a defendant to and from the courtroom." *People v Horn*, 279 Mich App 31, 37; 755 NW2d 212 (2008). "Further, when jurors inadvertently see a defendant in shackles, there still must be some showing that the defendant was prejudiced." *Id.* See also *United States v Olano*, 62 F3d 1180, 1190 (CA 9, 1995) (stating that "a jury's brief or inadvertent glimpse of a defendant in physical restraints is not inherently or presumptively prejudicial to a defendant.").

McCants has not made that showing. Instead, he informed the court that he believed that some members of the jury had seen him in shackles and that it might affect his presumption of innocence. He asserted that the officers escorting him could confirm his story, but he did not insist on questioning the officers, nor did he ask to question any of the jurors regarding what they may or may not have seen. Thus, the record only reflects McCants's belief that jury members may have seen him in shackles or handcuffs, but there is no indication that any member of the juror did, in fact, see him in such a state. In the absence of evidence that a juror may have seen McCants in restraints, we are unable to conclude that he suffered any prejudice. Because McCants cannot show error, much less plain error, he is not entitled to relief on the basis of this claim.

Moreover, even assuming *arguendo* that some members of the jury may have briefly and inadvertently seen McCants in shackles or handcuffs, McCants cannot show that his substantial rights were affected. Although a specific curative instruction was not given, the trial court instructed the jury on the presumption of innocence before the jury may have seen McCants in shackles, and it again instructed on the presumption when giving the jury its final instructions. "Jurors are presumed to follow their instructions, and instructions are presumed to cure most errors." *People v Abraham*, 256 Mich App 265, 279; 662 NW2d 836 (2003). Here, given the isolated and brief nature of any potential viewing of McCants in shackles, McCants has not overcome the presumption that the jury followed the instructions to presume he was innocent.

Finally, the record reflects that significant effort was made to ensure that McCants would not be observed by the jury while he was physically restrained. Thus, even assuming *arguendo* that McCants could satisfy his burden of showing plain error affecting his substantial rights, reversal is not warranted because he has not shown that the fairness, integrity and public reputation of the judicial proceedings were seriously affected by the brief and inadvertent alleged error.

-5-

## III.  DEFENSE WITNESS IN SHACKLES

### A.  STANDARD OF REVIEW

McCants also argues that his due process right to a fair trial was violated because the defense witnesses appeared shackled and in jail clothes.  After all of the defense witnesses testified, McCants made the following record:

> *McCants*.  I would just like the record to reflect that all the witnesses that were brought in on behalf of the defense were bound in jail and full jail uniform; in chains and handcuffs.  The prosecutor's witness, who was also in custody, was brought in in regular street clothing.

He did not request the court taken any action to cure any prejudice to his defense caused by the witnesses jail attire and visible physical restraints.  Nor did he make a request prior to their testimony that they be allowed to testify while unrestrained and while wearing street clothing.  Consequently, this issue is unpreserved.  Our review is, therefore, for plain error affecting McCants's substantial rights.  *Carines*, 460 Mich at 763.

### B.  ANALYSIS

"[T]he handcuffing or shackling of a witness during trial should be permitted only to prevent the escape of the witness, to prevent the witness from injuring others in the courtroom, or to maintain an orderly trial."  *People v Banks*, 249 Mich App 247, 257; 642 NW2d 351 (2002).  Here, the record is devoid of any indication that the trial court even considered whether the shackles were necessary.  Indeed, prior to McCants noting the existence of the shackles after the defense rested, there is nothing on the record indicating that it was even a concern.  We conclude that the trial court clearly erred by permitting the witnesses to be shackled during their testimony without first making the requisite determination as to whether the shackles were necessary.

Reversal is not warranted, however.  The prejudice to the defense from a defense witness being shackled is that the jury might infer that the witness is less credible.  *Id*. at 259.  Here, each of the defense witnesses testified that they had met McCants's lawyer while they were incarcerated and that they had not received any deals or offers in exchange for their testimony.  During closing argument, McCants's lawyer relied on the fact that the witnesses were incarcerated and wearing jail clothes during their testimony to argue that they were more credible than the prosecutor's incarcerated witness, who was testifying pursuant to a plea agreement.

> There was another witness who was charged, nearly of the same crimes, and made a deal.  And his deal, you can judge his credibility.  The gentleman there, with "sinner" tattooed on his forehead; and you can judge by his smile, his smirk, if you decided that; and you can decide whether that witness is credible.

> His testimony wasn't purchased, but it was bargained for; and that kind of goes to his credibility.  My witnesses came in; they're wearing their jail suits; they admit to what they did; they didn't have 'em dress down; they had no incentives; they had no deals, no offers; and they testified.

Thus, as part of the defense strategy, it is clear that the witnesses being shackled and in jail clothes was intended to increase rather than decrease their credibility.

Moreover, the defense theory was that Wist was the individual who harmed Sorensen and that the drugs located in Sorensen's vehicle belonged to Wist. He argued that there was testimony both for and against Sorensen's vehicle being driven without permission, that there was evidence suggesting that Sorensen stayed because he wanted drugs, and that only Sorensen testified to the sexual abuse and the jury could disbelieve his testimony. Given the defense arguments, and based on our review of the entire record, we conclude that the defense witnesses' testimony was helpful, but not crucial to the defense.

One of the defense witnesses testified that he had never been to the apartment and that he never met McCants. The other three defense witnesses offered testimony indicating that early in April 2019, they observed Sorensen at the apartment. They stated that he was not injured and appeared free to leave. Their testimony, therefore, was limited to what happened or did not happen at the beginning of Sorensen's time in the apartment. Their testimony does nothing to challenge the credibility of the evidence supporting that Sorensen was physically abused and was held captive. Indeed, photographs of Sorensen's injuries were admitted, a video of him being tormented was admitted, and multiple witnesses—including a doctor—testified regarding his extensive injuries. Furthermore, notwithstanding the testimony that Sorensen appeared free to leave, the record reflects that he was deprived of his vehicle, his money, and his credit cards. He was threatened with bodily harm, death, and the deaths of his family. He was injected with methamphetamines, locked in a closet, made to crawl on his hands and knees, made to walk a field to pick a place to die, and was beaten until his arms, hands, and feet were bruised. He sustained multiple facial fractures severe enough that his vision was threatened. Sorensen testified that the abuse escalated over time, and the medical doctor testified that the injuries appeared to have been inflicted over time. Thus, even if the credibility of the witnesses was impacted by their being in jail clothes and shackles, it was not outcome determinative. Reversal is not warranted.

Affirmed.

/s/ Kathleen Jansen
/s/ Michael J. Kelly
/s/ Amy Ronayne Krause