*If this opinion indicates that it is "FOR PUBLICATION," it is subject to
revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

UNPUBLISHED
January 12, 2023

Plaintiff-Appellee,

v

No. 353150
Ingham Circuit Court
LC No. 18-001064-FC

STEVEN DORNAE WASHINGTON,

Defendant-Appellant.

Before: HOOD, P.J., and JANSEN and K. F. KELLY, JJ.

PER CURIAM.

Defendant, Steven Dornae Washington, appeals as of right his convictions by a jury of second-degree murder, MCL 750.317; carrying a concealed weapon (CCW), MCL 750.227; and possession of a firearm during the commission of a felony (felony-firearm), MCL 750.227b. The trial court sentenced him to 330 to 495 months' imprisonment for second-degree murder, 476 days' imprisonment for CCW, and two years' imprisonment for felony-firearm. We affirm.

## I. BACKGROUND

Washington's convictions arise from the shooting death of Isai Berrones in East Lansing in 2018. At trial, the prosecution presented evidence that two women, Alake Chatman (Berrones's girlfriend) and Miracle Chatman, were angry that an acquaintance, Hannah Michner, was left alone at a bar. They confronted Michner's friend, Ivan Keener, about the situation. Keener, in turn, became angry with Alake and Miracle and telephoned his cousins, Jessica and Angela Kelly, for them to "fight" Alake and Miracle. Angela Kelly was Washington's girlfriend. Keener, Jessica, Angela, and Washington went to Alake and Miracle's apartment complex for this fight. During the interaction Washington shot and killed Berrones.

At trial, Keener testified for the prosecution pursuant to a "use immunity" agreement. The agreement prohibited the prosecution from using Keener's testimony in Washington's trial against Keener in his criminal case. Keener testified that he was at Michner's home in the early morning hours of October 12, 2018, after leaving local bars. He admitted he was drunk and high on marijuana at the time. Keener testified that he spoke with Alake earlier in the night when she called him from Michner's cellular telephone and angry that Michner was left at the bar, drunk

-1-

and alone. Keener responded by telling Alake and Miracle that his cousins, Jessica and Angela, would "beat them up." Keener indicated that Alake and Miracle "push[ed]" and "bump[ed] into" him. He did not wish to fight them because he is "a guy," but he wanted his "girl cousins" to fight them. At some point, Alake and Miracle left and returned to their own apartment complex. It appears that Alake and Miracle retained possession of Michner's cellular telephone. Keener called Jessica and, shortly thereafter, Jessica, Angela, and Washington (Angela's boyfriend) arrived at Michner's house.

Keener testified that the plan was to retrieve Michner's cellular telephone from Alake and Miracle, and then Jessica and Angela would fight them. Keener called Michner's telephone and, according to him, Alake and Miracle "agree[d] that they wanted to fight." He denied having a firearm. He also denied knowing that any of the others he was with had a firearm when his group left for Alake and Miracle's apartment complex. When they arrived at the apartment complex, the women started physically fighting. Keener testified that Berrones came out of the apartment complex, and Keener believed Berrones had a knife. Keener further testified that he ran and said that Berrones had a knife.

Keener testified that Washington went up to Berrones, that Berrones held something in his hand, and that Washington had his hand extended. Keener further testified that Berrones gestured toward Washington, Keener "heard a gunshot," and Berrones "spun and fell." Keener gave conflicting testimony regarding whether Berrones had a knife. Although he believed Berrones had a knife when he came out of the apartment, Keener admitted that he did not see "any type of implement" in Berrones's hand. Keener also gave conflicting testimony about whether Washington had a firearm. He testified that it "looked like [Washington] had a gun out." But when asked whether he actually saw a firearm in Washington's hand, Keener stated, "Not really, no." On cross-examination, he indicated that he "saw what [he] thought looked like . . . he was holding a gun."

Other testimony at trial established that Jessica and Angela arrived at Keener's house with a man from Mississippi who was later identified as Washington. Testimony also showed that the man from Mississippi had a "gun in his hand" and was "ma[king] it known that he had a gun." That individual watched as the women fought outside the apartment complex where Alake and Miracle lived. At one point during the fight at the apartment complex, witnesses heard gunshots. Alake testified that she had not heard the gunshots, but saw the women who had attacked her "running" and Berrones on the ground. Additional testimony showed that Washington's cellular telephone was in Lansing on the day of the shooting, but had moved to southern Ohio the following day. Washington was subsequently arrested in Columbus, Ohio. The prosecution's tool mark expert also testified that a shell casing from the shooting scene had marks from the same source as the marks on cartridges found in Angela's vehicle. Investigators located Washington's identification items in Angela's vehicle.

The jury convicted Washington as charged. After the verdict, Washington moved for a new trial and evidentiary hearing. He noted that Keener had pending (but unrelated) charges for criminal sexual conduct (CSC), and argued that an evidentiary hearing was necessary to explore whether the CSC investigation into Keener was ongoing at the time of trial but not disclosed by the prosecutor. Although Washington's attorney at the motion hearing (a different attorney than who represented him at trial) acknowledged that there were no pending CSC charges at the time

of trial, she argued that the existence of the investigation was a proper basis for impeaching Keener. Washington also sought an evidentiary hearing related to the prosecution's failure to disclose that Keener had pleaded guilty to drunk-and-disorderly conduct and was awaiting sentencing at the time of Washington's trial. This, Washington implied, was enough to show potential bias in Keener's testimony.

The prosecution responded, indicating that the police were unaware of Keener's possible involvement in the CSC case "until 2020" and, regardless, the prosecution was not required under *Brady v Maryland*, 373 US 83; 83 S Ct 1194; 10 L Ed 2d 215 (1963), to disclose that Keener was under investigation in an unrelated matter. The prosecution further asserted that the jury had heard that Keener could have been biased because of the charges he was facing in connection with Berrones's murder. Regarding the drunk-and-disorderly conviction, the prosecution noted that Keener had pleaded guilty to that offense nine months before Washington's trial and there was no indication that Keener received a reduced charge or delayed sentence for the drunk-and-disorderly conviction in exchange for his testimony at Washington's trial.

The trial court scheduled an evidentiary hearing regarding the CSC investigation issue, but ruled that the drunk-and-disorderly conviction would not be a subject of the hearing. The court found that the drunk-and-disorderly conviction did not contain an element of theft, false statement, or dishonesty and, therefore, could not be used for impeachment. It also found that there was no assertion of a deal between Keener and the prosecution regarding that offense, and there was no ineffective assistance of counsel with respect to discovering the drunk-and-disorderly conviction.

The trial court held an evidentiary hearing regarding the CSC investigation into Keener. Keener testified that he was charged in the CSC case in October 2020. At the hearing, the CSC complainant, TB, testified that she reported to the ELPD in July 2017 that she was sexually assaulted by two people. Although, at the time, TB knew the name of one of her assailants, "Andre," she did not know the other assailant's name. She testified that she returned to the police in November 2019 and gave them Keener's full name. Testimony from officers of the ELPD indicated, however, that TB provided only a first name, "Ivan," and his full name was not determined until late January 2020 or early February 2020. The primary prosecutor on Washington's case stated he was "[a]bsolutely not" aware at the time of trial that Keener was under investigation for CSC.

The trial court found that neither the ELPD nor the prosecution knew Keener's identity in connection with the CSC case either before or during Washington's trial. Rather, the court found that Keener's full name was not known by the ELPD until after Washington's trial. This appeal followed.

## II. *BRADY* VIOLATIONS

Washington first argues that the prosecution violated *Brady* when it failed to disclose (1) that ELPD was investigating Keener in an unrelated case for CSC, and (2) that Keener had a conviction for drunk-and-disorderly conduct for which he was waiting to be sentenced. Washington asserts that the trial court erred by denying his motion for a new trial or evidentiary hearing on these issues. We disagree and address each issue in turn.

## A. LEGAL STANDARDS

"This Court reviews for an abuse of discretion a trial court's decision to grant or deny a motion for a new trial." *People v Rao*, 491 Mich 271, 279; 815 NW2d 105 (2012). "An abuse of discretion occurs when the trial court renders a decision falling outside the range of principled decisions." *Id*. "A trial court's decision on a *Brady* claim is reviewed de novo." *People v Christian*, ___ Mich ___, ___; ___ NW2d ___ (2022) (Docket Nos. 162354, 162355, and 162374); slip op at 20. A trial court's factual findings are reviewed for clear error. See, e.g., *People v Martin*, 271 Mich App 280, 297; 721 NW2d 815 (2006), aff'd in part 482 Mich 851 (2008). "Clear error exists when the reviewing court is left with the definite and firm conviction that a mistake has been made." *People v Anderson*, 284 Mich App 11, 13; 772 NW2d 792 (2009) (quotation marks and citation omitted).

"To establish a *Brady* violation, a defendant must show that: (1) the prosecution has suppressed evidence; (2) that is favorable to the accused; and (3) that is material." *Christian*, ___ Mich at ___; slip op at 21 (quotation marks and citation omitted). The evidence may be favorable to the accused because it is exculpatory or impeaching. See *Strickler v Greene*, 527 US 263, 281-282; 119 S Ct 1936; 144 L Ed 2d 286 (1999). That is, the duty to disclose extends to impeachment evidence as well as exculpatory evidence, and applies to evidence even if it is known only to police investigators and not the prosecutor. *Youngblood v West Virginia*, 547 US 867, 869-870; 126 S Ct 2188; 165 L Ed 2d 269 (2006) (citations omitted). That a prosecution witness has *pending* charges is particularly relevant to the witness's interest in testifying and may be admitted for impeachment purposes. *People v Brownridge (On Remand)*, 237 Mich App 210, 214-215; 602 NW2d 584 (1999) (citation omitted). Accordingly, "the prosecution has a duty to disclose charges *pending* against a witness." *Id*. at 215 (citation omitted; emphasis added).

The "materiality" requirement is also referred to as the "prejudice" prong. See *People v Chenault*, 495 Mich 142, 149-150; 845 NW2d 731 (2014). To establish the materiality or prejudice prong,

> a defendant must show that there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A "reasonable probability" means a probability sufficient to undermine confidence in the outcome. A defendant need not demonstrate by a preponderance that disclosure of the suppressed evidence would have resulted ultimately in the defendant's acquittal. Rather, the relevant question is whether the defendant received a fair trial, understood as a trial resulting in a verdict worthy of confidence. [*Christian*, ___ Mich at ___; slip op at 21-22 (cleaned up).]

The prosecutor "has a duty to learn of any favorable evidence known to the others acting on the government's behalf in the case, including the police." *Kyles v Whitley*, 514 US 419, 437; 115 S Ct 1555; 131 L Ed 2d 490 (1995).

## B. CSC INVESTIGATION INTO KEENER

The trial court did not err when it denied Washington's motion for a new trial based on the alleged *Brady* violation related to the CSC investigation into Keener. As an initial matter, because

the proposed evidence involved a pending CSC investigation, rather than a conviction, it was inadmissible as impeachment evidence under MRE 609. See MRE 609 (providing for impeachment by evidence of criminal convictions involving an element of dishonesty or false statement or felonies involving an element of theft and having significant probative value); see also *People v Hall*, 174 Mich App 686, 690; 436 NW2d 446 (1989) (indicating that under MRE 609, pending charges may not be used to impeach a witness).[1]

But MRE 609 does not apply to pending charges or investigations that may show a witness's interest in testifying or potential bias. *People v Layher*, 464 Mich 756, 771; 631 NW2d 281 (2001); *Hall*, 174 Mich App at 690-691. Here, for it to be "favorable" under *Brady*, the evidence would have to show that Keener had an interest in testifying. *People v Brownridge (On Remand)*, 237 Mich App 210, 214; 602 NW2d 584 (1999). At a minimum, Keener would have to have known he was the subject of an investigation. See *id.*

This Court addressed this issue in *People v Brownridge*. There, the defendant argued reversal was warranted because the prosecution failed to disclose that an important prosecution witness was under investigation for felony welfare fraud. *Id.* at 214-215. This Court concluded that the defendant had "cited no authority supporting the conclusion that the prosecution has a duty to disclose that a witness is under investigation in an unrelated matter, nor are we disposed to so hold in the absence of precedent." *Id.* at 215. In *Brownridge*, the defendant failed to establish "whether the investigation was active when [the witness] testified at his trial, and, if so, whether [the witness] or the prosecution was aware of the investigation." *Id.* This Court, therefore, concluded that defendant had "failed to establish a *Brady* violation and that the trial court did not err in denying defendant's motion for a new trial on this ground," *id.*, because without knowledge of the investigation, there was no inference that the witness had an interest in testifying, see *id.*

Here, without evidence of Keener's knowledge of the investigation, there is no basis for the defense to argue that Keener was a biased witness. In other words, Keener could not have an interest in testifying favorably for the prosecution if he did not know there was a CSC investigation against him.

In addition to Keener's lack of knowledge, the court found that even ELPD was unaware of Keener's connection to the CSC allegation until after Washington's trial. Although the CSC

---

[1] Even if it were a conviction, it likely would have been inadmissible for failing to meet the other requirements of MRE 609 or presenting a risk of confusion or unfair prejudice that outweighed the probative value related to his credibility. See MRE 609(a); MRE 403; see also *People v Storch*, 176 Mich App 414, 421-422; 440 NW2d 14 (1989) (holding that alibi witness's convictions for criminal sexual conduct were inadmissible, where it did not involve dishonesty, false statement or theft and was "minimally, if at all, probative on the issue of credibility."). Further, although *Hall* and *Storch* are not strictly binding pursuant to MCR 7.215(J)(1) because they were issued before November 1, 1990, as published opinions, they nevertheless have "precedential effect under the rule of stare decisis" pursuant to MCR 7.215(C)(2). The same applies to *People v Mumford*, 183 Mich App 149; 455 NW2d 51 (1990), cited later in this opinion, as it was decided on April 2, 1990, and released for publication on May 9, 1990.

complainant testified that she gave ELPD Keener's full name in November 2019, testimony from the officers involved in that investigation indicated that the complainant only gave them a first name: "Ivan." ELPD did not know the subject was "Ivan Keener" until either late January 2020 or early February 2020.  Keener acknowledged, however, that he was first contacted by the police about the CSC investigation on March 4, 2020.  Washington's trial took place in December 2019. Washington has simply not established that the CSC "evidence" would have been favorable in terms of Keener's purported interest in testifying.

Under all these circumstances, we are unable to conclude that the trial court clearly erred by concluding that Keener was not a suspect in the CSC case until February 2020—approximately two months after Washington's trial ended.[2]  The duty to disclose relates only to pending investigations and charges against a witness that affect their interest in testifying, see *Brownridge*, 237 Mich App at 214-215, not an investigation of which the subject-witness is unaware. Washington has not cited any authority supporting his position that disclosure was required for such an investigation.  Accordingly, we conclude that the information about the CSC was not material, the prosecution was under no duty to disclose it, see *Brownridge*, 237 Mich App at 215, and the trial court did not abuse its discretion by denying the motion for a new trial in connection with the CSC investigation.

Washington argues that evidence of the CSC investigation was admissible under MRE 404(b) because it was "particularly relevant as it would be proof of his motive in testifying as he did for the prosecution."  Washington's reliance on MRE 404(b) is misplaced for two reasons. First, evidence of bias or interest in a case is highly relevant to credibility, which is of the utmost importance in every case.  *People v Mumford*, 183 Mich App 149, 152; 455 NW2d 51 (1990). Such evidence does not have to pass through the lens of MRE 404(b).  But, as stated, Keener's lack of knowledge of the investigation means that there was no evidence of bias or interest in the case.

Second, even if MRE 404(b) applied to this sort of evidence, it would still be inadmissible under MRE 403.  MRE 404(b) allows admission of other bad acts for nonpropensity purposes, such as, identity, intent, lack of mistake, common scheme or plan, or motive.  The trial court may exclude otherwise admissible other-acts evidence, however, if it violates MRE 403.  *People v VanderVliet*, 444 Mich 52, 55; 508 NW2d 114 (1993) (articulating test for evaluating the admissibility of other-acts evidence).  Under MRE 403, relevant evidence may be excluded "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence."  Allowing evidence that Keener was under investigation for CSC in an unrelated matter would create a trial within a trial on the issue of CSC, which would be confusing for the jury, cause undue delay, and waste time.  Accordingly, even if the CSC investigation were relevant, it would have been properly excluded under MRE 403.

---

[2] We do not agree with defendant's argument on appeal that the police should have known immediately, because of the alleged rareness of the name, that the name "Ivan" was a reference to the Ivan Keener associated with the murder case.

-6-

## C. KEENER'S DRUNK-AND-DISORDERLY-CONDUCT CONVICTION

Washington also argues that the prosecution violated *Brady* when it failed to disclose that, at the time of trial, Keener was awaiting sentencing for a drunk-and-disorderly-conduct conviction and the trial court erred by failing to grant an evidentiary hearing or a new trial in connection with this conviction. We disagree.

The court ruled that a drunk-and-disorderly-conduct conviction does not contain an element of theft, false statement, or dishonesty and could not be used for impeachment. It also noted that there was no assertion that any "deal" had been reached between the prosecution and Keener regarding that offense. It ruled that the issue of this offense would not be a subject at the evidentiary hearing.

Evidence of Keener's drunk-and-disorderly-conduct conviction, and the fact that he was awaiting sentencing for the conviction at the time of Washington's trial, was inadmissible. See MRE 609(a). To attack a witness's credibility with evidence of a prior conviction, the crime must contain an element of dishonesty or false statement, MRE 609(a)(1), or it must be a felony with an element of theft and "significant probative value on the issue of credibility" of the witness. See MRE 609(a)(2). There is no evidence that Keener's drunk-and-disorderly-conduct conviction, a misdemeanor subject to imprisonment for not more than 90 days, satisfied any of these requirements. See MCL 750.167; MCL 750.168. Accordingly, we discern no error in the trial court's findings that the conviction did not involve an element of dishonesty, false statement, or theft.

Moreover, Washington cannot demonstrate that the absence of information regarding Keener's drunk-and-disorderly-conduct conviction deprived Washington of a fair trial. *Chenault*, 495 Mich at 157. Although Keener awaited sentencing for his drunk-and-disorderly-conduct conviction at the time of Washington's trial, the value of that impeachment evidence paled in comparison to the impeachment to which he was already subject as a result of the circumstances surrounding Berrones's murder. At Washington's trial, Keener testified that he was facing charges of "accessory after the fact" to murder in connection with Berrones's death, as well as a charge of conspiracy to commit assault and battery in connection with the criminal incident. Keener testified at Washington's trial under "use immunity," meaning that anything he said in court for Washington's trial would not be used in Keener's criminal cases. Thus, Washington has failed to demonstrate that the absence of evidence related to Keener's drunk-and-disorderly-conduct conviction deprived him of a fair trial.

We also note that, during Keener's testimony, Washington's attorney heavily implied that Keener was the shooter. The prosecution itself, during closing arguments, suggested that some of Keener's testimony was not believable because he downplayed how aggressive he was on the night of the shooting and had implied that the shooting involved an element of self-defense. Defense counsel, in his extensive closing argument, argued that Keener shot Berrones but blamed Washington, and stated that Keener was "the one person that has every reason in the world to lie to you." He said that "[e]ven the prosecutor told you he lied to you. Lie after lie after lie, running and hiding." During jury instructions, the court stated that the jury could use Keener's use-immunity agreement in evaluating his credibility because "it may tend to show his bias or self-interest." The absence of cumulative impeachment evidence in connection with the disorderly

conduct conviction did not deprive Washington of a fair trial or result in a verdict unworthy of confidence. *Chenault*, 495 Mich at 157; *Kyles*, 514 US at 434.[3]

### D. INEFFECTIVE ASSISTANCE OF COUNSEL RELATED TO ALLEGED *BRADY* VIOLATION

Washington also argues that defense counsel was ineffective for failing to discover the disorderly-conduct conviction. We disagree.

To obtain a new trial on the basis of ineffective assistance of counsel, a party must establish that "(1) counsel's performance fell below an objective standard of reasonableness and (2) but for counsel's deficient performance, there is a reasonable probability that the outcome [of trial] would have been different." *People v Trakhtenberg*, 493 Mich 38, 51-52, 826 NW2d 136 (2012) (citations omitted). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *People v Ackley*, 497 Mich 381, 389; 870 NW2d 858 (2015) (quotation marks and citation omitted). Although counsel may be ineffective for failing to adequately investigate and prepare for trial, *id.* at 389, counsel cannot be ineffective for failing to undertake a futile gesture, *People v Ericksen*, 288 Mich App 192, 201; 793 NW2d 120 (2010).

Evidence of the drunk-and-disorderly-conduct condition was inadmissible, and defense counsel is not ineffective for failing to pursue what would have amounted to a futile gesture. *Ericksen*, 288 Mich App at 201. Even if defense counsel should have discovered Keener's drunk-and-disorderly-conduct conviction, Washington was not prejudiced by the absence of that information at trial. As noted, the impeachment value of the fact that Keener was awaiting sentencing for the drunk-and-disorderly-conduct conviction was substantially less than the fact that he was currently facing charges related to Berrones's murder. Washington has, therefore, not established a reasonable probability that, if counsel had investigated Keener more thoroughly, the outcome of the trial would have been different. *Trakhtenberg*, 493 Mich at 51-52.

### III. STATEMENT BY COURT CLERK

Washington next argues that statements by the court clerk overheard by jurors warranted a mistrial. We disagree.

---

[3] We note, too, that Keener is the only witness who gave any indication that the shooting occurred during an act of self-defense. Further impeaching Keener's credibility would likely have undermined his testimony about self-defense, a theory that Washington advanced at trial. In addition, when asked at trial if he had actually seen a gun in Washington's hand, Keener said, "Not really, no." On cross-examination, defense counsel asked, "[Y]ou saw a gun[?]" and Keener replied, "I didn't say I saw a gun. I saw what I thought looked like . . . he was holding a gun." Other witnesses described Washington as having had a gun that night. Also, the prosecution's toolmark expert testified that the spent shell casing from the scene had toolmarks from the same source as the toolmarks on cartridges found in a vehicle that also contained identification items pertaining to Washington. Keener's testimony, while important, was not nearly as critical as portrayed by Washington on appeal.

This Court reviews for an abuse of discretion a trial court's decision regarding a motion for a mistrial. *People v Dennis*, 464 Mich 567, 572; 628 NW2d 502 (2001). Constitutional issues are reviewed de novo. *People v Wiley*, 324 Mich App 130, 150; 919 NW2d 802 (2018).

Washington analogizes his circumstances to those in which a defendant is seen by the jury in restraints or prison garb. But the analogy is inapt. In *People v Boshell*, 337 Mich App 322, 335-336; 975 NW2d 72 (2021), this Court reiterated that

> [e]very defendant has a due process right to a fair trial, which includes the right to be presumed innocent. Under the presumption of innocence, guilt must be determined solely on the basis of the evidence introduced at trial rather than on official suspicion, indictment, continued custody, or other circumstances not adduced as proof at trial. [Quotation marks and citations omitted.]

"Included within the right to a fair trial, absent extraordinary circumstances, is the right to be free of shackles or handcuffs in the courtroom." *People v Payne*, 285 Mich App 181, 186; 774 NW2d 714 (2009) (citation omitted). Although the right to appear at trial without physical restraints is "not absolute" it is, nevertheless, an "important component of a fair trial" because appearing before the jury handcuffed or shackled "negatively affects the defendant's constitutionally guaranteed presumption of innocence[.]" *People v Banks*, 249 Mich App 247, 256; 642 NW2d 351 (2002) (citation omitted).

Here, after a break but before the jury instructions, a clerk knocked on the door of the jury room and asked someone, in the presence of the jury, if the sheriff had been called for purposes of bringing Washington to the courtroom. At trial, but outside the jury's presence, the bailiff stated, "I believe [the clerk] asked me 'Could you call the sheriff to have the Defendant brought up[?]' " The court stated for the record that Washington was not seen in custody and that Washington had not worn leg cuffs or other restraints. After this incident, defense counsel told Washington that his recommendation was to not ask for a curative instruction because it would emphasize the comment, and he stated, "Maybe half of the jury, maybe ten of the jurors didn't even hear that little comment." Although the implication of this comment is apparent for attorneys, judges, and court staff, to a layperson, the comment may have been taken as a sign of the regular order of proceedings for a criminal defendant on trial. This "little comment," as defense counsel put it, did not brand Washington with an unmistakable mark of guilt from the jurors' perspective. As stated in *Holbrook v Flynn*, 475 US 560, 567; 106 S Ct 1340; 89 L Ed 2d 525 (1986):

> Central to the right to a fair trial, guaranteed by the Sixth and Fourteenth Amendments, is the principle that one accused of a crime is entitled to have his guilt or innocence determined solely on the basis of the evidence introduced at trial, and not on grounds of official suspicion, indictment, continued custody, or other circumstances not adduced as proof at trial. This does not mean, however, that every practice tending to single out the accused from everyone else in the courtroom must be struck down. Recognizing that jurors are quite aware that the defendant appearing before them did not arrive there by choice or happenstance, *we have never tried, and could never hope, to eliminate from trial procedures every reminder that the State has chosen to marshal its resources against a defendant to*

-9-

*punish him for allegedly criminal conduct.* [Quotation marks and citation omitted; emphasis added.]

The state had reason for having Washington in the custody of the sheriff. The fact that jurors may have overheard the clerk asking whether Washington was retrieved by the sheriff does not warrant a new trial because, as the *Holbrook* Court noted, jurors are "quite aware" that a criminal defendant is not present at trial by choice. *Id.* The trial court did not abuse its discretion by denying the motion for a mistrial.

## VI. CUMULATIVE ERROR

Finally, Washington argues that he is entitled to reversal on the basis of cumulative error. We disagree.

"The cumulative effect of several errors can constitute sufficient prejudice to warrant reversal where the prejudice of any one error would not." *People v LeBlanc*, 465 Mich 575, 591; 640 NW2d 246 (2002). "In order to reverse on the grounds of cumulative error, the errors at issue must be of consequence." *People v Knapp*, 244 Mich App 361, 388; 624 NW2d 227 (2001). "In other words, the effect of the errors must have been seriously prejudicial in order to warrant a finding that defendant was denied a fair trial." *Id.* "[O]nly actual errors are aggregated to determine their cumulative effect." *People v Bahoda*, 448 Mich 261, 292 n 64; 531 NW2d 659 (1995).

As discussed, there were no *Brady* errors, nor any meritorious argument regarding ineffective assistance of counsel. There was also no error related to the clerk's mention of the sheriff in the presence of jurors. Because there were no actual errors, Washington's arguments related to cumulative error are without merit. See *Bahoda*, 448 Mich at 292 n 64.

We affirm.

/s/ Noah P. Hood
/s/ Kathleen Jansen
/s/ Kirsten Frank Kelly