*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

    Plaintiff-Appellee,

v

JOSE AUGUSTINE GARCIA, JR.,

    Defendant-Appellant.

UNPUBLISHED
November 22, 2024
9:50 AM

No. 367905
St. Clair Circuit Court
LC No. 22-001683-FH

Before: FEENEY, P.J., and O'BRIEN and WALLACE, JJ.

PER CURIAM.

Defendant appeals as of right his jury-trial convictions of three counts of second-degree child abuse, MCL 750.136b(3), and one count of assault with intent to do great bodily harm less than murder by strangulation or suffocation (AWIGBH), MCL 750.84. We affirm.

## I. BACKGROUND

This matter involves the child abuse of TDF and LG. Defendant was trained in martial arts. TDF is defendant's stepson and LG is his biological son. Defendant used martial arts to discipline the boys, which included placing them in chokeholds, punching, kicking, and making TDF and LG spar, sometimes until they bled. Defendant was arrested and charged with three counts of second-degree child abuse and one count AWIGBH.

Prior to being charged in the present case, defendant was tried before a jury in 2019, on allegations that he had been strangling TDF, which resulted in a not guilty verdict.

Before trial in the present case, defendant moved to exclude the testimony of Dr. Kelly Berishaj who was to testify about the pathophysiology of strangulation and its consequences on children. The trial court held a hearing in accordance with *Daubert v Merrell Dow Pharm, Inc*, 509 US 579; 113 S Ct 2786; 125 L Ed 2d 469 (1993), and determined Berishaj was qualified to testify as an expert in forensic strangulation, and found her testimony would assist the jury to understand the physical and mental effects of a chokehold on TDF and LG. Defendant was convicted by jury of all charges and sentenced as discussed above. This appeal followed.

-1-

On appeal, defendant argues: (1) the trial court violated his due-process rights by allowing the prosecution to present portions of the video recording of his police interview after defendant's testimony and the defense had rested, and the trial court's remedy did not address the due-process violation; (2) defendant was denied a fair trial because the trial court admitted unfairly prejudicial and unhelpful expert testimony about the pathophysiology of strangulation; and (3) defense counsel was ineffective for not objecting when a witness testified about delayed disclosures.

## II. VIDEO OF INTERVIEW

Defendant argues the trial court violated his due-process rights when it allowed the prosecution to present portions of the video of his police interview after the defense had rested, despite the fact that the prosecution failed to produce a copy of the video to defendant until after the first day of trial, and the trial court's remedy was insufficient to address this violation.[1] We agree that the trial court abused its discretion when it allowed the video into evidence because it had not been timely disclosed to defendant; however, the error was harmless.

## A. STANDARD OF REVIEW

"To preserve an evidentiary issue for appellate review, a party must object timely at trial and specify the same ground for objection as is asserted on appeal." *People v Considine*, 196 Mich App 160, 162; 492 NW2d 465 (1992). Defendant objected to the introduction of the video at the time of trial; however, the prosecution argues that defendant did not object to the trial court's remedy for the prosecution's failure to timely disclose the video, resulting in that portion of the issue being unpreserved. However, we need not determine whether defendant's objection preserved the issue because we find that the error committed by the trial court was harmless.

The issue of whether defendant received a fair trial "is a question of constitutional law that this Court reviews de novo." *People v Stevens*, 498 Mich 162, 168; 869 NW2d 233 (2015). This Court reviews "a trial court's decision regarding the appropriate remedy for a discovery violation for an abuse of discretion." *People v Dickinson*, 321 Mich App 1, 17; 909 NW2d 24 (2017). "An abuse of discretion occurs when the court chooses an outcome that falls outside the range of reasonable and principled outcomes." *People v Unger*, 278 Mich App 210, 217; 749 NW2d 272 (2008).

Defendant alleges that the discovery violation by the prosecutor in this case constituted a violation of defendant's right to due process under the United States Constitution, relying upon *People v Pace*, 102 Mich App 522; 302 NW2d 216 (1980) and *People v Turner*, 120 Mich App 3; 328 NW2d 5 (1982)[2], where this Court found that a discovery order violation by a prosecutor raises the issue of a denial of constitutional rights. However, both *Pace* and *Turner* were decided before the decision in *People v Taylo*r, 159 Mich App 468, 471; 416 NW2d 390 (1987), where this Court

---

[1] The video consisted of two clips totaling approximately 56 seconds.

[2] Overruled on other grounds by *People v Randolph*, 466 Mich 532, 546; 648 NW2d 532 (2002), which was superseded by statute on other grounds as recognized by *People v March*, 499 Mich 389, 401 n 5; 886 NW2d 396 (2016).

later disagreed with that view, and before the Michigan Supreme Court's decision in *People v Elston*, 462 Mich 751; 614 NW2d 595 (2000). In *Elston*, a case involving charges of criminal sexual conduct, the defendant moved for the suppression of evidence of sperm fragments that neither party had learned about until the first day of trial. *Id*. at 757-758. The Michigan Supreme Court held that, "There is no general constitutional right to discovery in a criminal case. *People v. Stanaway*, 446 Mich. 643, 664, 521 N.W.2d 557 (1994), citing *Weatherford v. Bursey*, 429 U.S. 545, 559, 97 S.Ct. 837, 51 L.Ed.2d 30 (1977). Accordingly, a prosecutorial violation of MCR 6.201(A) based on a failure to disclose the laboratory report or wet swab sample would have been nonconstitutional in nature." *Elston*, 462 Mich at 765-766.

## B. ANALYSIS

A criminal defendant has a right to a fair and impartial trial. US Const, Am VI; Const 1963, art 1, § 20. "There is no general constitutional right to discovery in a criminal case." *People v Elston*, 462 Mich 751, 765; 614 NW2d 595 (2000). However, "[d]ue process requires the prosecution to disclose evidence in its possession that is exculpatory and material, regardless of whether the defendant requests the disclosure." *People v Schumacher*, 276 Mich App 165, 176; 740 NW2d 534 (2007).

MCR 6.201(B) states:

Upon request, the prosecuting attorney must provide each defendant:

\* \* \*

(3) any written or recorded statements, including electronically recorded statements, by a defendant, codefendant, or accomplice pertaining to the case, even if that person is not a prospective witness at trial[.]

The prosecution conceded it erred by not providing the defense with defendant's video interview before trial. Once it became apparent the defense had not received the video, the prosecution provided it on the evening of the first day of trial. Defense counsel acknowledged receiving the video, but was unable to view it because he had an "old computer at home and it wouldn't play." The parties do not dispute this resulted in a violation of MCR 6.201(B)(3). The trial court agreed and fashioned a remedy.

MCR 6.201(J) states:

If a party fails to comply with this rule, the court, in its discretion, may order the party to provide the discovery or permit the inspection of materials not previously disclosed, grant a continuance, prohibit the party from introducing in evidence the material not disclosed, or enter such other order as it deems just under the circumstances.

"When determining the appropriate remedy for discovery violations, the trial court must balance the interests of the courts, the public, and the parties in light of all the relevant circumstances, including the reasons for noncompliance." *People v Banks*, 249 Mich App 247, 252; 642 NW2d 351 (2002).

The trial court noted defendant had an interest "in preparing his own case, or his opportunity to test the authenticity of his opponent's evidence . . . ." The trial court observed, "the late disclosure certainly placed [] Defendant at a disadvantage as it relates to being able to properly review that video in preparation for trial." At the same time, the trial court noted "defendant should know what he said on the video." The trial court allowed the video to be played, but "grant[ed] a continuance to the Defense . . . to be able to view the video in full prior to the rebuttal evidence being played in front of the Jury." Further, the trial court allowed defendant "to reopen proofs if there is something on the video that he finds relevant and would have changed the course of his case-in-chief."

In support of the admission of the video as evidence the court relied upon *People v Finley*, 161 Mich App 1; 410 NW2d 282 (1987). In *Finley*, during rebuttal, the prosecutor introduced evidence regarding a statement that the defendant made to a detective that had never been disclosed to defense counsel. *Id*. at 9-10. The trial court ruled that the prosecutor's failure to disclose the statement did not violate the discovery order and this Court agreed. *Id*. However, the facts in *Finley* are in stark contrast to those in the instant case. As this Court noted in *Finley*, the statement made by the defendant in that case was not written or recorded - it was put into evidence via testimony of the detective. *Id*. at 9-10. Because it was oral evidence, there was no basis on which to argue that it violated the trial court's discovery order, which "merely required the disclosure of defendant's written or recorded statements." *Id*. at 10. In contrast, in the present case, there is no dispute that the prosecution's failure to provide the video recording violated the discovery rules. As such, the trial court misapplied *Finley*.

The trial court also did not recognize that, because of the prosecution's failure to timely produce the video, defendant never had the opportunity to refresh his recollection regarding the contents of an interview that had occurred more than a year and a half before the trial, including any minor details he may have forgotten. That fact provided the prosecution with an unfair advantage because, by not timely producing the video, the prosecution could portray defendant as being dishonest unless he had a perfect memory of everything he had said to investigators over 18 months ago.

In balancing the interests of the parties, the trial court should have observed that the testimony at issue was arguably only nominally probative of one element in this matter, which was defendant's intent, i.e., the testimony about defendant experiencing physical discipline or punishment when he was raised might make it more likely that he believed his "training" sessions with the children did not constitute child abuse. However, the issue of defendant's own childhood punishment was not raised by defendant, that evidence was first inserted into the case by the prosecution via a leading question posed to Detective Silver during direct examination. Also, the video evidence was not offered by the prosecution as evidence of intent or any other element of the crimes with which defendant was charged. Rather, the video was presented solely for the purposes of impeaching defendant's credibility, i.e., the sole reason for the prosecution's introduction of the video, which it failed to timely produce, was to cast doubt upon the forthrightness of defendant about an issue defendant had not raised.

This Court's opinion in *Banks* presents a good example of a situation where a trial court did not err when it allowed evidence of prior statements not disclosed by the prosecution until after the testimony of an examining witness. *Banks* arose out of an armed assault that occurred when

-4-

the victim was attacked by two men with ski masks. *Banks*, 249 Mich App at 249. At trial, the victim said that he had seen the two men remove their ski masks, and could therefore identify them. *Id*. The defendant's cross examination of the victim focused on the fact that he had not likewise testified during the preliminary examination, i.e., he had not testified that he saw the attackers remove their ski masks. *Id*. at 249-250. When the defendant confronted the victim with the allegation that he had never previously indicated that he saw the assailants remove their masks, the victim rejected that assertion by stating that he had, in fact, told the police that he saw the assailants remove their masks. *Id*. at 250. After the victim's testimony was complete, the defendant was given a copy of the police report, for the first time, which corroborated the victim's trial testimony in which he said he told the police that he saw his attackers remove their masks. *Id*. The defendant then moved for a mistrial which the trial court denied. *Id*. at 250. On appeal, the defendant argued "the discovery violation was highly prejudicial in light of his strategy to impeach [the witness] with his testimonial inconsistencies." *Id*. at 252. Had the police report been disclosed, defendant claimed, he would have prepared differently for trial. This Court agreed that the defendant's cross-examination likely would have, at least in part, been different if he had been previously given the report. However, this Court affirmed the trial court's decision to deny the motion for a mistrial, despite the discovery violation. This Court reasoned, in part, that "[d]iscrepancies between [the witness's] preliminary examination and trial testimony existed despite what was contained in the police report," and the defendant "was able to explore these discrepancies at length." *Id*. at 254.

In *Banks*, the untimely disclosed police report corroborated the trial testimony of the victim and never came into evidence, i.e., the report was given to the defendant after the victim finished testifying and the jury never knew the report existed. In contrast, in the present case, the video interview that the prosecution failed to disclose contradicted the defendant's own trial testimony and was presented as evidence to the jury to impeach that testimony.

Pursuant to *Banks*, when the trial court in the present case was determining how to remedy the prosecution's failure to timely disclose the video, it should have balanced the interests of the courts, the public, and the parties in light of all the relevant circumstances, including the reasons for noncompliance. First, the prosecution offered no reason for noncompliance, other than to suggest that it was inadvertent. So, at best, it can be said that the prosecution neglected its duty to produce the video. Second, in balancing the interests of the court, the public, and the parties, in light of the fact that defendant had already testified before he had a chance to review the one-and-a-half-year-old video, the court should have considered whether justice demanded some other potential remedy, such as suppression of the video. If the video had contained clear evidence that defendant had contradicted himself regarding an element of the crimes for which he was charged, then justice may have demanded that the video should be allowed as evidence even though it was not timely disclosed. But here, as noted above, the discrepancy between the video and defendant's trial testimony was not relevant to prove any of the prosecution's theories of the case; rather, it was used solely as impeachment on an issue that was not an element of any of the charges brought against defendant. As such, we find that the trial court abused its discretion by allowing the prosecution to introduce the video as evidence.

We now turn to the issue of whether the trial court's error, in allowing production of the evidence, was harmless. On this issue, the Michigan Supreme Court's recitation of the law in *Elston* is instructive.

In order to overcome the presumption that a preserved nonconstitutional error is harmless, a defendant must persuade the reviewing court that it is more probable than not that the error in question was outcome determinative. *People v. Lukity*, 460 Mich. 484, 495–496, 596 N.W.2d 607 (1999). An error is deemed to have been "outcome determinative" if it undermined the reliability of the verdict. See *People v. Snyder*, 462 Mich. 38, 45, 609 N.W.2d 831 (2000), citing *Lukity*, *supra* at 495–496, 596 N.W.2d 607. In making this determination, the reviewing court should focus on the nature of the error in light of the weight and strength of the untainted evidence. See *Lukity*, *supra* at 495, 596 N.W.2d 607; *People v. Mateo*, 453 Mich. 203, 215, 551 N.W.2d 891 (1996). [*Elston*, 462 Mich at 766.]

Based on the record before us, we are not persuaded that it is more probable than not that the trial court's error in admitting the video clips was outcome determinative, i.e., we do not believe the admission of that evidence undermined the reliability of the verdict because, even without the subject video, the weight and strength of the evidence supporting the charges against defendant at trial was overwhelming.

Defendant's ex-wife testified that there had been about a six month pause from the time of defendant's 2019 trial to the time that he again started fighting with the children. Her testimony was that, at that time, she saw defendant punch the children in the face, kick the children, put them in different mixed martial arts moves, including arm bars and others, and that by the end of those occasions the children would usually be crying and asking defendant to stop. But, according to her testimony, even when the children were crying and asking him to stop, he would not do so - she said defendant would only stop when defendant said they could stop. She said oftentimes they had bloody noses, or injuries to their lips after they were done, and she would see marks or bruises from the injuries. She said he often used this force on the children as a way of disciplining them. She also provided testimony that defendant had acknowledged, after his 2019 trial, that such conduct was wrong. Finally, she also testified that, in 2022, she and defendant engaged in a verbal argument that turned physical when defendant locked all of their communication devices in a bedroom, and then pinned her down, covered her mouth, and put her in a choke hold, all in the presence of TDF.

TDF was fourteen at the time of the trial. He testified that he would get in trouble for petty things and defendant would tell him that he had to fight him, which involved punching, kicking and chokeholds, all of which started when he was four years old. He agreed that it ceased for a while after the 2019 trial, but it started again when TDF started getting in trouble and had to fight defendant, which occurred more than once per week. He said defendant would do the more harmful things when his mother was out of the house, i.e., defendant would hurt him more when she was gone, resulting in cuts, fat lips, and cuts to the lips. TDF also testified to an incident in which defendant kneed him in the side of the head really hard, as a result of which he had tunnel vision (he said he saw stars and temporarily lost his peripheral vision, but could see straight ahead). The knee to the head occurred after defendant knocked TDF to the ground, after which TDF refused to get up as he did not want the fight to continue (the knee to the head occurred when defendant came after him again). TDF also testified about occasions in which defendant would put him in an armbar or chokehold, which he described as defendant putting one arm around TDF's neck, and then locking the other arm behind TDF's head, and then squeezing, which occurred

multiple times. TDF said that it was hard for him to breathe during the chokeholds and that defendant's chokeholds made him lose consciousness a couple of time (he also clarified that those occasions occurred after the last trial). In addition, TDF said defendant would make him fight with LG.

LG was nine years old at the time of trial. He testified that he was punched in the stomach and face by defendant, which left red marks, and was also kicked by defendant. He said defendant put him in chokeholds on more than three occasions, during which it would be hard to breathe. He said, on the occasions when he would ask defendant to stop, defendant would keep going. He said that sometimes these fighting incidents with defendant occurred in a bedroom where defendant would lock the door so that LG's mother could not get in. He said it hurt when defendant punched him and that defendant knocked him down a lot.

Cailin Wilson testified at the trial that she was the prosecuting attorney in the 2019 case in which defendant had been tried for allegedly strangling TDF. She explained that she called a forensic nurse as an expert in that case who testified about the risks associated strangulation. She said, after the trial, the defendant flagged her down in the hallway and was very emotional. She said he thanked her for calling the expert witness and said the witness had provided him with information that he had not known. Her testimony was that he also said, if he had known of the risks that the expert described, he never would have done that with his children, and promised to never do it again.

One of the officers who investigated the case against defendant, Detective Edward Silver, testified at the trial that defendant admitted during an interview to doing mixed martial arts fighting with his children and that the fighting was used as a form of punishment. The detective said defendant admitted that sometimes the children would cry and not want to fight with him and also admitted to performing chokeholds on the children.

After considering all of the evidence in its totality, including the testimony of defendant's wife, TDF, LG, Cailin Wilson, Detective Silver, and two expert witnesses, as well as various admissions made by defendant during his testimony at trial, it would not be reasonable to hold that the outcome would have been different had the trial court refused to admit the 56 seconds worth of video into evidence. Thus, we find that the trial court's error was harmless.

## III. PREJUDICIAL EXPERT TESTIMONY

Next, defendant argues he was denied a fair trial because the trial court admitted Berishaj's testimony about the pathophysiological effects of strangulation. We disagree.

## A. STANDARD OF REVIEW

"This Court reviews for an abuse of discretion a circuit court's decision to admit or exclude evidence." *People v Kowalski*, 492 Mich 106, 119; 821 NW2d 14 (2012). "An abuse of discretion occurs when the court chooses an outcome that falls outside the range of reasonable and principled outcomes." *Unger*, 278 Mich App at 217.

## B. ANALYSIS

A criminal defendant has a right to a fair and impartial trial. US Const, Am VI; Const 1963, art 1, § 20. "[Michigan Rule of Evidence] MRE 702 establishes prerequisites for the admission of expert witness testimony." *Kowalski*, 492 Mich at 119. MRE 702[3] states:

> If the court determines that scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise if (1) the testimony is based on sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

"MRE 702 incorporates the standards of reliability that the United States Supreme Court established in *Daubert*[], 509 US 579 . . . in interpreting the equivalent federal rule of evidence." *People v Muhammad*, 326 Mich App 40, 51-52; 931 NW2d 20 (2018). The United States Supreme Court requires trial courts to "determine at the outset . . . whether the expert is proposing to testify to (1) scientific knowledge that (2) will assist the trier of fact to understand or determine a fact in issue." *Daubert*, 509 US at 592. "This entails a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue." *Id*. at 592-593. This Court has observed:

> Some factors that bear on the trial court's inquiry include: (1) whether the scientific knowledge or technique can, and has been, tested, (2) whether the theory or technique has been subjected to peer review and publication, (3) the known or potential rate of error, (4) the existence and maintenance of standards controlling the technique's operation, and (5) whether there is general acceptance of the scientific technique. [*Muhammad*, 326 Mich App at 52 (quotation marks and citation omitted).]

"Many factors will bear on the inquiry . . ." and there is no presumption of "a definitive checklist or test." *Daubert*, 509 US at 593.

"Pursuant to *Daubert* and MRE 702, the trial court's role as gatekeeper does not require it to search for absolute truth, to admit only uncontested evidence, or to resolve genuine scientific disputes." *Muhammad*, 326 Mich App at 52 (quotation marks and citation omitted). "In other words, [t]he inquiry is not into whether an expert's opinion is necessarily correct or universally accepted, it is into whether the opinion is rationally derived from a sound foundation." *Id*. (quotation marks and citation omitted; alteration in original). "The standard focuses on the

---

[3] The Michigan Rules of Evidence were substantially amended on September 20, 2023, effective January 1, 2024. See ADM File No. 2021-10, 512 Mich lxiii (2023). We rely on the version of the rules in effect at the time of defendant's trial.

scientific validity of the expert's methods rather than on the correctness or soundness of the expert's particular proposed testimony." *Id*. at 52-53 (quotation marks and citation omitted).

The first *Daubert* factor considers whether "scientific knowledge that will assist the trier of fact . . . can be (and has been) tested." *Daubert*, 509 US at 593. The trial court noted strangulation as a subfield of forensic nursing "seems to be in its relative infancy in that it seems to have populated itself since the year 2017." However, the trial court noted "there are studies going back many years . . . done on prisoners and mental health patients regarding how long it takes to strangle somebody, what happens when one second, two seconds of pressure is applied [to the neck], how long it takes to pass out . . . ." "The scientific validity . . . is not duplication of [comparing] data against data that is existing." Rather, "it is this expert's [Berishaj's] interpretation of the data that is already existing . . . ." The trial court stated, "scientific validity to the sense [sic] that it would have to be replicated is not an issue." "The information, experience, training, knowledge, and education acquired by this expert will allow her to testify as it relates to strangulation, the effects on the body, and the effects from a mental health standpoint." Further, Berishaj was in the process of completing a research study "to be testing on a variety of manners, cadavers, end block organs, potentially animals that are not living, and as well as creating our own model out of materials so that we can test pressures and how much pressure it takes to occlude vasculature." The earlier studies and Berishaj's ongoing study demonstrate scientific research on strangulation "can be (and has been) tested." *Daubert*, 509 US at 593. As a result, "[t]he trial court [correctly] found that it has been sufficiently tested, and facts in the record support that conclusion." *Muhammad*, 326 Mich App at 53.

Next, the trial court considered the helpfulness of Berishaj's testimony "which is the value added to the jury." The trial court noted the "jury will have to understand the effects, both physical and mental as a result of being strangled or having a chokehold applied . . . [and] whether or not those acts are likely to cause a serious physical or mental health issue."

Defendant was charged with three counts of second-degree child abuse and one count of AWIGBH by strangulation. MCL 750.136b(3) states:

A person is guilty of child abuse in the second degree if any of the following apply:

(a) The person's omission causes serious physical harm or serious mental harm to a child or if the person's reckless act causes serious physical harm or serious mental harm to a child.

(b) The person knowingly or intentionally commits an act likely to cause serious physical or mental harm to a child regardless of whether harm results.

(c) The person knowingly or intentionally commits an act that is cruel to a child regardless of whether harm results.

The issue was whether the chokehold charged in Count 1 was "likely to cause serious physical or mental harm . . . ." MCL 750.136b(3)(b). "Serious physical harm" is "any physical injury to a child that seriously impairs the child's health or physical well-being . . . ." MCL

-9-

750.136(1)(e). The question for the jury was whether defendant knowingly or intentionally committed an act likely to seriously impair TDF's and LG's health or physical well-being. There was no dispute defendant performed chokeholds. The issue was whether the chokeholds were likely to seriously impair the children's health. This determination would be challenging for the jury because the physical effects of chokeholds are not readily apparent in TDF and LG who appeared healthy at trial. As a result, the trial court correctly held Berishaj's testimony would assist the jury "to understand the effects . . . of being strangled or having a chokehold applied . . . [and] whether or not those acts are likely to cause a serious physical or mental health issue."

"[E]xperts are permitted to draw and testify regarding conclusions that encompass a question to be decided by the jury, so long as the expert does not purport—or . . . even appear to purport—to draw a legal conclusion." *People v Ackley*, 336 Mich App 586, 595; 970 NW2d 917 (2021). This does not provide experts with carte blanche. Experts are not permitted to provide testimony coming "too close" to findings within the jury's purview. *People v McFarlane*, 325 Mich App 507, 521; 926 NW2d 339 (2018) (quotation marks and citation omitted). "For example, in cases involving criminal sexual conduct, an expert may not offer an opinion that the alleged victim had in fact been sexually abused, may not offer testimony that vouches for the victim's veracity, and may not offer an opinion that the defendant is guilty." *Id*. at 521-522. "The same is true for expert testimony on 'battered-woman syndrome': the expert may not opine that the complainant was in fact a battered woman, may not testify that the defendant is guilty, and may not comment on the complainant's veracity." *Id*. at 522.

TDF's and LG's experiencing serious physical harm as a result of the chokeholds was a question of fact to be decided by the jury. But to assist the jury, "[i]t [was] necessary for an expert to testify about the types of injuries typically observed with [strangulation] in children and to describe the possible mechanisms of injury involved." *Id*. Further, "an expert may not tell the jury how to decide the case, but may offer an opinion on an ultimate issue if the expert's experience and training is in an area that is largely unfamiliar to the jury." *Id*. at 523. Berishaj testified about "(1) scientific knowledge that (2) will assist the trier of fact to understand or determine a fact in issue." *Daubert*, 509 US at 592. As a result, the trial court did not err when it admitted Berishaj's testimony under *Daubert* and MRE 702.

Next, defendant argues the trial court should have excluded Berishaj's testimony because it was significantly more prejudicial than probative. We disagree.

Relevant evidence is generally admissible and irrelevant evidence is inadmissible. MRE 402. Evidence is relevant if "it has any tendency to make a fact more or less probable than it would be without the evidence[.]" MRE 401. "Relevance involves two elements, materiality and probative value." *People v Benton*, 294 Mich App 191, 199; 817 NW2d 599 (2011) (quotation marks and citation omitted). Relevant evidence may be excluded "if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." MRE 403. Importantly, "MRE 403 does not prohibit prejudicial evidence; only evidence that is unfairly so." *People v Mardlin*, 487 Mich 609, 627; 790 NW2d 607 (2010) (quotation marks and citation omitted). "Unfair prejudice may exist where there is a danger that the evidence will be given undue or preemptive weight by the jury or where it would be inequitable to allow use of the evidence." *People v Blackston*, 481 Mich 451, 462; 751 NW2d 408 (2008).

-10-

The trial court noted, Berishaj "will not be testifying as to whether or not [TDF and LG] themselves were placed in a chokehold, but [] only supplying expert testimony as to what happens when a person is . . . placed in a chokehold." During her testimony Berishaj never commented on TDF and LG. Indeed, Berishaj emphasized she did not examine TDF and LG. As discussed, the purpose of her testimony was to establish the pathophysiological effects of strangulation—effects not easily observable in two children who appeared healthy on the witness stand. Berishaj's testimony is prejudicial, but is not unfairly so. "All evidence offered by the parties is 'prejudicial' to some extent, but the fear of prejudice does not generally render the evidence inadmissible. It is only when the probative value is *substantially outweighed* by the danger of unfair prejudice that evidence is excluded." *People v Mills*, 450 Mich 61, 75; 537 NW2d 909 (1995), mod 450 Mich 1212 (1995). As a result, the trial court did not abuse its discretion when it admitted Berishaj's testimony.

## IV. INEFFECTIVE ASSISTANCE OF COUNSEL

Defendant argues defense counsel was ineffective for failing to object to Liesl Dobozy's statements regarding delayed disclosures. We disagree.

## A. STANDARD OF REVIEW

A claim for ineffective assistance of counsel is preserved by moving for a new trial or for a *Ginther*[4] hearing. See *People v Lopez*, 305 Mich App 686, 693; 854 NW2d 205 (2014). Defendant can also preserve this issue "by filing in this Court a motion for remand to the trial court for a *Ginther* hearing." *People v Abcumby-Blair*, 335 Mich App 210, 227; 966 NW2d 437 (2020). Defendant did not take these steps, resulting in his claim for ineffective assistance of counsel being unpreserved. Because no factual record was made with respect to defendant's claim, this Court's review is limited to mistakes apparent on the record. *People v Heft*, 299 Mich App 69, 80; 829 NW2d 266 (2012).

## B. ANALYSIS

The United States and Michigan Constitutions protect a defendant's right to a fair trial. US Const, Am VI; Const 1963, art 1, § 17. "This right includes the right to the effective assistance of counsel." *People v Isrow*, 339 Mich App 522, 531; 984 NW2d 528 (2021) (quotation marks and citation omitted). "To establish a claim of ineffective assistance of counsel a defendant must show that counsel's performance was deficient and that counsel's deficient performance prejudiced the defense." *People v Fyda*, 288 Mich App 446, 450; 793 NW2d 712 (2010). "A counsel's performance was deficient if it fell below an objective standard of professional reasonableness." *Id*. "The performance prejudiced the defense if it is reasonably probable that, but for counsel's error, the result of the proceeding would have been different." *Id*. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland v Washington*, 466 US 668, 694; 104 S Ct 2052; 80 L Ed 2d 674 (1984). Both conditions must be met to establish ineffective assistance of counsel.

---

[4] *People v Ginther*, 390 Mich 436, 443; 212 NW2d 922 (1973).

"Claims of ineffective assistance of counsel center on deficiencies in the defense counsel's decision-making . . . ." *Isrow*, 339 Mich App 532 (quotation marks and citation omitted; alteration in original). "In examining whether defense counsel's performance fell below an objective standard of reasonableness, a defendant must overcome the strong presumption that counsel's performance was born from a sound trial strategy." *People v Trakhtenberg*, 493 Mich 38, 52; 826 NW2d 136 (2012). "If counsel's strategy is reasonable, then his or her performance was not deficient." *Isrow*, 339 Mich App at 532 (quotation marks and citation omitted). "A deficiency prejudices a defendant when there is a reasonable probability that but for trial counsel's errors, the verdict would have been different." *Id*.

Dobozy conducted the forensic interviews of TDF and LG in June 2022. She testified as an expert in forensic interviewing at defendant's trial. The prosecution asked Dobozy if she was "familiar with the term delayed disclosure[.]" After replying in the affirmative, she explained: "Delayed disclosure would be any time after an incident happens that the child would disclose. So anything other than immediate [sic] right after something happens." The prosecution inquired if she was "familiar with some of the reasons that a child may have a delayed disclosure[.]" Dobozy explained:

> In my experience delayed disclosure could be from the child not feeling safe where they are living currently or in what situation they're in. It could, there could be family dynamics, um, other than safety also. And then when the child comes in for a forensic interview, they're meeting a forensic interviewer for the first time and then sitting down to, to talk. So that could also delay a disclosure if they don't feel comfortable talking to that person.

"Delayed disclosure refers to [] abuse victims, including children, not immediately informing others of the abuse that transpired." *People v Dobek*, 274 Mich App 58, 76 n 8; 732 NW2d 546 (2007) (quotation marks omitted).

In *People v Beckley*, 434 Mich 691, 716-717; 456 NW2d 391 (1990), our Supreme Court noted:

> The findings of professional research suggest that there are many seemingly inconsistent responses to the trauma of the incident which require some form of explanation . . . . [A] possible misconception concerning the child victim is the belief that when a child suffers an injury it will be reported immediately.

Similarly, in *People v Peterson*, 450 Mich 349, 379; 537 NW2d 857 (1995), our Supreme Court held "the trial court exercised the proper discretion in allowing a single expert to clarify why child victims of [] assault frequently delay reporting the incident."

In *Dobek*, 274 Mich App at 78, the defendant argued that the prosecutor committed misconduct when eliciting testimony from a police officer about delayed disclosure without qualifying the officer as an expert. This Court disagreed, finding even if the officer was not an expert, his "testimony on delayed disclosure was drawn from his past experiences and training."

As in *Beckley* and *Peterson*, and unlike in *Dobek*, Dobozy, who was qualified as an expert, testified regarding delayed disclosure, which is within the parameters of forensic interviewing.

Further, Dobozy noted that her definition of delayed disclosure was based on her experience, and did not suggest the term applied to TDF and LG. Even if defense counsel had objected, the objection would have been meritless. As our Supreme Court has explained, "[d]efense counsel is not ineffective for failing to advance a meritless or frivolous argument." *People v Leffew*, 508 Mich 625, 638; 975 NW2d 896 (2022). As a result, defendant's argument of ineffective assistance of counsel fails.

## V. CONCLUSION

For the reasons discussed above, we affirm.


/s/ Kathleen A. Feeney
/s/ Randy J. Wallace